# 24-2007

## 22-cv-5017(PMH)

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

——— »« ———

CHRISTA O'NEILL,

*Plaintiff-Appellant,*

v.

NEWBURGH ENLARGED CITY
SCHOOL DISTRICT,

——————    *Defendant-Respondent.*

*On Appeal from the United States District Court
for the Southern District of New York (New York)*

## APPELLANT'S BRIEF

**STEWART LEE KARLIN
LAW GROUP, P.C.**

Stewart Lee Karlin, Esq.
*Attorneys for Plaintiff-Appellant*
111 John Street, 22nd Floor
New York, New York
(212) 792-9670

Reproduced On Recycled Paper

## **TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................i-ii

TABLE OF AUTHORITIES ....................................................iii-v

STATEMENT OF SUBJECT OF JURISDICTION ...................................1

STATEMENT OF THE ISSUES................................................ 1-3

NATURE OF THE CASE ......................................................3

STATEMENT OF FACTS .................................................... 3-

    1.    Procedural History................................................3

    2.    Factual Background...................................... 4-40

        A.    The Pandemic Year Imposed on Appellant Many
            Additional Responsibilities that Similarly Situated
            Peers Did Not Have ........................................ 8-11

        B.    Additional Record Keeping- the Duplicative and
            Time-Consuming Google Attendance ................................ 11-12

        C.    The Consent Requirement.................................... 12-15

        D.    Meetings Addressing The Documentation On Two
            Attendance Platforms When Documentation Was
            Only Necessary Using One Platform According to
            the Director of Special Education for the District ............. 15-19

        E.    The 3020-a Proceeding ..................................... 19-22

        F.    The Supreme Court's Order of February 24, 2023............. 22-27

        G.    The District Court Summary Judgment Decision............... 27-31

H.     Testimony of Principal Brooks ............................................ 31-33

I.      Testimony of Special Education Director Orwick.............. 33-35

J.     Testimony of Christianne Pryne and Linda Catalusci ........ 35-36

K.    Testimony of Brancato........................................................ 36-38

SUMMARY OF THE ARGUMENT .................................................. 38-40

ARGUMENT ...................................................................................... 41-55

POINT I: THE APPROPRIATE STANDARD OF REVIEW
OF A GRANTING OF A MOTION FOR SUMMARY JUDGMENT
IS A DE NOVO REVIEW OF THE RECORD ..................................... 41-42

POINT II: THE APPELLEE IS COLLATERALLY ESTOPPED
FROM ASSERTING IT HAD LEGITIMATE REASONS FOR
APPELLANT'S TERMINATION ........................................................... 43-46

POINT III: THERE WERE MATERIAL FACTUAL ISSUES
WITH RESPECT TO WHETHER RACIAL ANIMUS PLAYED
A ROLE IN APPELLANT'S TERMINATION ......................................... 47-

A.    The Totality of the Circumstances Here Give Rise To
An Inference of Discrimination .......................................... 48-50

B.    Defendant's Baseless Assertions ........................................ 50-55

CONCLUSION ...................................................................................... 56

CERTIFICATION PURSUANT TO
Fed. R. App. P. 32(a)(7)(B) and (c) ...................................................... 57

# TABLE OF AUTHORITIES

*Laws and Statutes*

28 USC § 1291................................................................................1

28 USC § 1331................................................................................1

28 USC § 1367................................................................................1

Federal Rule of Civil of Procedure 56 ..........................................3

Full Faith and Credit Clause, U.S. Constitution............................43

New York State Human Rights Law................................................47

Title VII .................................................................................. sic passim

*Cases*

<u>77 Water St., Inc. v. JTC Painting & Decorating,</u>
148 A.D.3d 1092, 1095, 50 N.Y.S.3d 471 (2d Dep't 2017) ........................................43

<u>Abramovich v Board of Ed. of Ed. Of Cent. Sch. Dist. No. 1 of
Towns of Brookhaven & Smithtown,</u>
91 Misc. 2d 481, 485 [Suffolk County 1977) aff'd 46 NY2d 450
[2d Dept 1979) ........................................................................26

<u>Anderson v. Liberty Lobby, Inc.,</u>
supra, 477 US at 2242, 255 (1986) .........................................41

<u>Anonymous v. Dobbs Ferry Union Free Sch. Dist.,</u>
19 A.D.3d 522, 522, 797 N.Y.S.2d 120 (2d Dep't 2005) ............44

<u>Brown v. Montefiore Med. Ctr.,</u>
168 A.D.3d 488, 92 N.Y.S.3d 217, 2019 N.Y. Slip Op. 226
(N.Y. App. Div. 2019) .............................................................51

<u>Celotex Corp. v. Catrett,</u>
477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ............................42

iii

Cronin v. Aetna Life Ins. Co.,
46 F.3d 196, 203 (2d Cir. 1995) ............................................................41

Curry v. City of Syracuse,
316 F.3d 324, 331 (2d Cir. 2003) ..........................................................43

D'Arata v. New York Cent. Mut. Fire Ins. Co.,
76 N.Y.2d 659, 664, 564 N.E.2d 634, 563 N.Y.S.2d 24 (1990) ...............43

Gomez v NY City Dept.,
2022 US Dist LEXIS 146751, at *14 [SDNY Aug. 15, 2022,
No. 21-CV-01711 (AT)(SN)] ..................................................................44

LaFleur v. Whitman,
300 F.3d 256, 272 (2d Cir. 2002) ..........................................................44

Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,
192 F.3d 337, 343 (2d Cir. 1999) ..........................................................41

Mandell v. County of Suffolk,
316 F.3d 368, 379 (2d Cir. 2003) ..........................................................47

Mario v. P&C Food Markets, Inc.,
313 F.3d 758, 763 (2d Cir. 2002) ..........................................................41

Matter of Denhoff v. Mamaroneck Union Free Sch. Dist.,
101 AD3d 997, 997-998 [2d Dept 20121] ...............................................27

Matushita Electric Industrial Co. v. Zenith Radio Corp.,
475 US 574, 586-87, 106 S.Ct. 1328, 1355-56, 89 L.Ed. 2d 538 (1086) ...............42

McGuinness v. Lincoln Hall,
263 F.3d 49, 54 (2d Cir. 2001) ..............................................................47

McKithen v. Brown,
481 F.3d 89, 105 (2d Cir. 2007) ............................................................43

Powell v New York City Dep't of Educ.,
144 AD3d 920 921 [2d Dept 2016] .........................................................27

iv

Reddy v. Catone,
630 Fed. Appx. 120, 121 (2d Cir. 2015) ...........................................43

Ryan v. New York, Tel. Co.,
62 N.Y. 2d 494, 500 (478 N.Y.S.2d 823 (1984) ...........................44

Staub v. Proctor Hosp.,
131 S. Ct. 1186, 1189 (2011) .............................................................50

Trans-Orient Marine Corp v. Star Trading & Marine, Inc.,
925 F.2d 566, 572 (2d Cir.1991) .......................................................42

United States v. Diebold Inc.,
369 U.S. 654 (1962) .............................................................................42

Vasquez v. Empress Ambulance Service, Inc.,
F.3D-No. 15-3239 (2d Cir. Aug. 29, 2016) ....................................50

Weg v. Macchiarola,
995 F.2d 15, 18 (2d Cir.1993) ...........................................................42

## STATEMENT OF SUBJECT OF JURISDICTION

The District Court had subject matter over this action pursuant to 28 USC § 1331 and 1367. A summary judgment granting Defendants' Motion for Summary Judgment by a Decision and Order dated June 26, 2024, duly entered in this action on the 26th day of June 2024 (R12-R49) and the judgment entered on June 26, 2024 (R50) dismissing Appellant Christa O'Neill's claim (hereinafter referred to as "Appellant" or "Ms. O'Neill"). On July 25, 2024, Appellant timely filed a notice of appeal (R11). Because the district court's order is final, this Court has appellate jurisdiction under 28 USC § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the Court erred in not finding the Respondent is collaterally estopped from asserting it had legitimate reasons for the Appellant's termination?

The answer should be in the affirmative because the Orange County Supreme Court specifically held that Ms. O'Neill's daily work doubled during COVID-19 and that she was required to keep attendance in multiple formats, conduct therapy sessions, attend IEP meetings, and write IEPs, evaluations, and coverages. An additional task that she was given was to mentor another speech therapist. During COVID-19, Ms. O'Neill worked through her prep time, lunch breaks, and after-hours in an attempt to keep up with all of her work. The unforeseen challenges due to COVID-19 and the additional duties that were given to Ms. O'Neill made

performance under the Last Change Agreement impossible (R1623-R1624). In addition, the additional duties and workload created by COVID were *not* substantially similar to her work duties when she entered into the Last Chance Agreement in 2019 (R1624).

2.  Whether the court erred when drawing all favorable inferences in Appellant's favor, whether there were material issues of fact as to whether racial animus played a role in the Appellant's termination?

The answer should be in the affirmative because of AP Brancato's Insistence that Appellant must complete both platforms given that she was already using IEP Direct, the enormity of her workload and other responsibilities, his demand that Google Attendance be inputted retroactively to September 2020, Appellant's several requests that she be relieved of Google Attendance inputting given her overall workload and responsibilities, that she was the only African-American speech and language pathologist in the Newburgh Enlarged City School District, that she was the only speech therapist and traveling provider who had the additional duties of covering classrooms and hall duty while and being required to utilize both platforms, and that Orwick's (Director of Special Education) sworn testimony as specifically communicated to Brancato that Google Attendance was not the requisite platform to be used by Special Education Department and that IEP direct suffices for attendance purposes, raises a bona fide issue of fact viewed in a light most

favorable to Appellant that Brancato was in fact motivated at least in part by racial animus.

## NATURE OF THE CASE

Appellant Christa O'Neill ("Appellant") appeals from the order of the United States District Court of the Southern District of New York (Hon. Judith C. McCarthy). Appellant commenced this action alleging race discrimination (African American) against the Newburgh Enlarged City School District ("Appellees" or "District") regarding Ms. O'Neill's termination. Appellant now appeals from the Decision and Order dated June 26, 2024, of the Honorable Judith C. McCarthy, who dismissed Appellant's action and granted Appellees' Summary Judgment Motion under Federal Rule of Civil of Procedure ("Fed. R. Civ. P.") 56.

## STATEMENT OF FACTS

### 1. Procedural History

Appellant commenced the action on June 15, 2022 (R51). Subsequently, the parties consented to have this matter heard by a Magistrate Judge for all purposes (R6-R7). Appellee moved for summary judgment, which was granted on June 26, 2024, over the Title VII claim (R89), and the Court declined to exercise supplemental jurisdiction over the state law claim under the New York State Human Rights Law. The Appellant filed a notice of appeal on July 25, 2024 (R11).

2.      **Factual Background**

Appellant is an African American, subjected to ongoing race discrimination as set forth below. (R1596)

Appellant has been a tenured Speech and Language Pathologist working for the Newburgh Enlarged City School District ("District") for over 19 years. For the past nine years, she has been assigned to the District's South Middle School. AP Brancato was the direct supervisor, and Principal Brooks had overall supervisory responsibilities for the entire building. Appellant received her bachelor's degree from Marymount Manhattan College and her graduate degree from Teachers College, Columbia University. Appellant holds a permanent New York State certificate as a Teacher of the Speech and Hearing Handicapped and a certificate of clinical competence from the American Speech-Language-Hearing Association. (R1596-R1597)

On June 24, 2022, the District commenced a 3020-A proceeding based on allegations that Appellant did not contemporaneously complete speech session logs and or IEP Direct service logs. The District did not charge her with failing to provide those sessions. Nor has the District alleged any student was impacted by the alleged failure to complete the session logs or IEP Direct service logs. (R1597) Her competency as a speech and language pathologist is not in question.

Appellant is the only African-American speech therapist in the District. There

are approximately sixteen speech therapists employed by the Appellee. Appellant had positive reviews until AP Vincent Brancato (Caucasian) began working at South Middle School. In addition, her supervisors are Caucasian to wit, Chris Bayer and Janet Orwick. Appellant has been working at South Middle School, grades 6 to 8, for about nine years. She has been subjected to disparate treatment because of her race. (R1597)

During the 2020-2021 school year (the pandemic year), the school was very short-staffed, and there was an overwhelming amount of additional work for her. Also, there were constant and sudden schedule changes. The traveling therapists were not mandated to have a duty in their schedule. Appellant was considered a traveling therapist since she traveled to another school three days a week during the pandemic year. (R1597)

Appellant was assigned an excessive caseload compared to her similarly situated peers. In fact, her similarly situated peers had no more than 65 cases, while Appellant had approximately 80 or more cases, contrary to New York State law that prohibits a speech therapist from having more than 65 cases. In addition, Appellant was given a caseload of over 65 cases for multiple years, even after alerting her Directors/Supervisors that her high caseload was illegal and a disservice to the students. (R1597)

Subsequently, Appellant requested that her caseload be reduced, and

eventually (belatedly) the District complied with her request, reducing the caseload. As a Speech and Language Pathologist with the District, Appellant is tasked with providing speech and language services to students who have been identified as needing those services and whose Individual Education Programs ("IEPs") require such services. Appellant had the most cases consistently throughout her tenure. In fact, in one year, Appellant had 92 students assigned to her. Before the COVID-19 pandemic, Appellant performed her work according to a set schedule, during which she provided multiple 30-minute individual and group speech sessions per day. Pre-pandemic, Appellant had one 45-minute prep period during which she would contact parents, prepare materials for sessions, and document sessions. (R1598)

As part of her responsibilities, Appellant is required to document her speech sessions via the IEP Direct platform. Documenting those services requires a multi-step process The process is as follows: (1) type into the search bar and search student ID; (2) then you select the student you're putting in the log for; (3) then you would go to related service logs and click; (4) then you would go to a drop-down that said "service provided" if there was a traditional service; (5) you would go to a different drop- down, select the ratio of the students in the group; (6) then you would go to a different drop-down and select setting; (7) then go to a different drop- down and select the time, start time, for example, 11:30 then end time12:00; (8) then you would go to another drop-down and you'd have to select the CPT code, the appropriate CPT

code; (8) then you go to another drop-down and select the ICD code; (9) then you would have to on the side make sure that the correct date is selected and check the correct date; (10) then you would hit save, and it would save all of that information and bring you to another section where you would enter a log note; (11) then you would have to manually type what happened in the session. And then you click save again; (12) then you would have to sign that session note and click save again. After all of that is done, then, you click save and return. There was no specific guideline as to when the information was to be inputted except as soon as practical. The input took between 2 to 5 minutes and averaged at least 70 minutes per day. (R1598-R1599)

Appellant would have to do this for every student, for every session. She had about fifty students, and each student had multiple sessions during a week. Appellant has been disciplined once before for conduct related to the documentation of speech services. That discipline was resolved by Stipulation of Settlement ("Settlement") dated July 15, 2019, and the District withdrew the charges. Those charges applied only to the 2016-2017 and 2017-2018 school years. (R1599)

In addition, Appellant has been moved over seven times in about twelve years. To her knowledge, no other speech and language pathologist has been moved with such great frequency. Most Speech and Language pathologists stayed put at one or two schools for years at a time. In fact, one Speech and Language Pathologist stayed

at the same school for over twenty years. Moving with such frequency adds a substantial burden since the speech and language pathologist must become familiar with students' prior histories, establish a rapport with the students, and plan a strategy that works best so that the students can progress educationally. In addition, one has to become familiar with new staff, administrators, and the rules of the building. (R1599)

Appellant has been subjected to microscopic scrutiny. For example, her Director/Supervisor (Daniella Lans-Caucasian) followed her and reported the Appellant's daily activities to other colleagues such as psychologists and lead teachers and supervisors. To Appellant's knowledge, no other Speech and Language Pathologist was subject to this level of scrutiny. (R1599-R1600)

Appellant requested COVID-19 childcare accommodations but was denied the request. Appellant requested fifteen minutes in the morning for daycare and was denied the request. Upon information and belief, other individuals, such as Lydia Rose (Caucasian), had childcare accommodations, and related service providers, such as Jenna Trapani. (R1600)

## A. The Pandemic Year Imposed on Appellant Many Additional Responsibilities that Similarly Situated Peers Did Not Have.

In addition to these challenges, the District imposed additional responsibilities above and beyond her regular duties. During the pandemic year, Appellant was asked to cover classes frequently. Although the schedule is set by Appellant, the

schedule, such as hall duty and supervisory duties, is set by the administration, and most times without notice. The additional responsibilities subsumed Appellant's prep period, lunch, Medicaid/report paperwork time, and other times when not providing speech services. Some days, Appellant used her prep period to deliver speech services. Some days, she did not have enough time to use the restroom because of the time constraints. (R1600)

The disparate treatment regarding class coverage during the 2020-2021 school year was because Appellant was required to cover for teachers who were quarantining and who were out from COVID-19 and other illnesses. However, no other related service providers in Appellant's building were required to cover classes for teachers who were out, and Appellant believes that no other Speech and Language pathologist was required to cover classes. (R1600)

During the 2020-2021 school year, Appellant had to cover between one hundred and one hundred and fifty classes. Covering a class is a fifty-minute period. Furthermore, the Appellant was considered a traveling service provider since she was assigned to more than one school. All the traveling service providers had no additional duties other than Appellant. To Appellant's knowledge, none of the traveling service providers were African-American. (R1600)

Appellant was also assigned supervisory duty because during the pandemic year, most students stayed in the same classroom, and the teacher moved.

Supervisory duty involves the teacher waiting in the classroom, usually about 10 to 12 minutes, so the students would not be left unsupervised. Appellant had supervisory duty about four times a day, which took another 45 minutes out of her day. This duty was just for the pandemic year. (R1601)

Appellant also had hall supervision during teachers' transition periods. This involved standing in the hall during transition periods (five to ten minutes) about once a day; the other service providers and travel service providers, including the Speech and Language Pathologist, did not have the hall and supervisory duties. Thus, the supervisor's duties and hall duties amounted to another period of additional duties during the pandemic year. To Appellant's knowledge, based on conversations with other speech therapists and service providers, they did not have to cover classes and hall duty. No other speech therapist had documentation in the two attendance platforms. No service provider had these extra duties. (R1601)

The Appellant spoke to many speech therapists at the time, and no other speech therapist, to her knowledge, had to cover classes, supervisory duty, or hall duty. In fact, Appellant spoke to Fran Carton (Caucasian), who was at Newburgh Free Academy High School, and she spoke to Jen Mojica, non-African-American-light skinned- and spoke to two other speech therapists, one at Temple Hill (K-8 school) and the other was Vailf Gate) and none of them had to cover classes, none of them had hall duty, and none of them had supervisory duty. Appellant spoke to

these individuals while they were working during work hours and within the scope of Appellant's and their job responsibilities. (R1601)

**B.** **Additional Record Keeping- the Duplicative and Time-Consuming Google Attendance**

Further acts of disparate treatment required extensive paperwork concerning attendance that similarly situated peers did not have to do. Appellant was also required to complete a Google attendance document. No other speech therapist in the entire District was required to use this additional attendance platform; no other Speech and Language Therapist had to perform the arduous and time-consuming task of documenting attendance and services performed on Google Docs. In fact, Appellant filed a grievance, and the South Middle School stopped using the platform at the end of the 20-21 school year, according to Ms. Pyrne. A typical group speech therapy session is 30 minutes. Each group had about 3 to 5 students, and Appellant had at least 30 group sessions per week. Regarding Google Docs, completing all of the paperwork requested (which was not required for any other speech therapist) took about two to three minutes per child. (average 20 or more students a day- approximately 50 minutes a day) Completing this paperwork during the session would take valuable speech therapy time away from the students and would be contrary to the requirements in the IEPs of these students that required a certain amount of speech therapy per week. Appellant stressed that point with her supervisors and A.P. (R1602)

In addition, a request was made in January that Appellant go back to the beginning of the year and complete all of the paperwork. Again, no other speech therapist was required to do this paperwork, and it entailed many hours of additional paperwork. This was in addition to Appellant's already demanding schedule and something that had never been asked of her before. The attendance document was introduced in January 2021, but Appellant was expected to complete it retroactively to the start of the 2020-2021 school year. The directives surrounding this document changed throughout the year, and with those changes, the time commitment increased as batch entries were no longer allowed. Appellant was instead required to enter each session, line-by-line, tediously. (R1602)

Upon information and belief, no other Speech and Language Pathologists (none are African-American) were required to complete a Google attendance document for each child and to complete it retroactively to the start of the 2020-2021 school year. (R1603)

## C. The Consent Requirement

At the start of the 2020-2021 school year, the District was in the throes of the COVID-19 pandemic. In response, the District started the school year fully remote, with all students attending school virtually. Gradually, the District expanded to in-person instruction, taking a hybrid approach whereby a limited number of students were in the school buildings on a given day while the others were remote. During

the pandemic and the District's hybrid instruction, Appellant provided services for her caseload of over 50 students. However, due to the challenges of the hybrid, remote, and in-person model, Appellant was forced to provide those services both in-person and virtually through Google Classroom. This also created a substantial amount of extra work. (R1603)

Appellant's professional pandemic stressors were further compounded by issues in her personal life. This was documented in Appellant's February 23, 2021, email to Janet Orwick; Appellant wrote, "It has been very busy here and personally. I have been trying to not take any leave as I know we are very short handed." Ms. Orwick never followed up to see what Appellant meant or to see if she needed any support. Also, Appellant's husband was injured at work and was out on disability. Both Appellant's elderly and infirm parents contracted the virus caused by COVID-19 between the Fall and Winter of 2020 and 2021. Further, her father-in-law had a massive heart attack requiring open-heart surgery and then months of recuperation at her house. On top of that, Appellant's daughter faced the challenges of negotiating a senior year that was turned upside down by the pandemic. Appellant explained all of this to her school principal, Chante Brooks. Despite these myriad challenges, Appellant took less than ten days off all school year because she knew the District could not spare to lose another employee and was concerned about her students due to the staffing shortages. (R1603-R1604)

Because many of Appellant's students were remote and could potentially be forced to remote due to a COVID-19 infection or quarantine, the District required the parents of all students on her caseload to consent to teletherapy. Consent was to be provided through a Google document consent form. Despite Appellant's efforts, including posting the form to Google Classroom and multiple emails and calls encouraging parents to complete the form, only seven or eight of her 50 students returned the consent form. The lack of consent directly impacted her reporting of services and whether those sessions counted as "units" for Medicaid billing purposes. (R1604). It should be noted that the responsibility of forwarding and getting the consent forms signed regarding the other service providers was the District Special Education Department, not the individual service provider (except Ms. O'Neill). (R1015-R1016)

Following a conversation regarding the impact of not having a consent form for the majority of students, Appellant's department agreed those students, when not attending an in- person session, should be noted as "student not available" for sessions logged via IEP Direct and a note would be made that no consent form was provided, and the student was not in the building due to COVID-19. The appellant discussed this manner of reporting with both South Middle School Principal Chante Brooks and Assistant Principal Vincent Brancato. Appellant also explained that she was not comfortable providing attendance information in the Google attendance

document for remote students whose parents had not consented to teletherapy. (R1604)

The lack of a consent form also impacted the reporting of sessions. Appellant explained that when a student was indicated in IEP Direct as "student not available" for a session because their parents had not consented to teletherapy, that session would not count towards the units required according to a student's IEP and the District was unable to bill Medicaid for that session. This is indicated in the Summary of Related Session Notes where, despite there being a session log for a student on a given day, if that session was virtual and the student indicated as "student not available," the CPT Units column would read "O." The session would not count towards the required units indicated in IEP Direct RS Attendance Summary reports. This meant that while there may be a log for a session, the mere existence of a log would not be reflected in the RS Attendance Summary reports. Accordingly, the Summary of Related Session Notes, not the RS Attendance Summary reports, is the best evidence of whether and when a session was provided and logged. In addition, Appellant categorically denies that she failed to document 887 sessions as alleged against her by the District. (R1604-R1605)

**D. Meetings Addressing The Documentation On Two Attendance Platforms When Documentation Was Only Necessary Using One Platform According to the Director of Special Education for the District**

In the Spring of 2021, the District administration raised concerns regarding

Appellant's documentation of services. Meetings were held to discuss these concerns, and Ms. Brooks and Mr. Brancato informed Appellant that they did not believe she was current with her attendance recording. The focus of those meetings was on the Google attendance document that Mr. Brancato had directed Appellant to complete. They never told Appellant that the IEP Direct was more important. At that time, the Appellant advised Principal Brooks and AP Arlene Almobobar of the personal issues in detail and that, given the extra amount of work (covering classes, hall duty, and supervisory duty), it was difficult to complete both platforms. Appellant also filed a grievance over the platform. This extra and unnecessary platform was then discontinued at the end of the school year. (R1605)

At the first meeting, around March of 2021, Appellant proposed solutions regarding how she might streamline the attendance process. Her suggestions were ignored. Appellant also explained the difficulties she had in completing both attendance platforms. These concerns were also ignored. She explained how time-consuming the data entry expectations were on top of her already demanding schedule and, again, was ignored. Appellant also explained the ethical concerns she had regarding entering attendance data for students without consent forms and how Mr. Brancato wanted to count those students. In response to Mr. Brancato's statement that teachers are required to keep attendance in a similar fashion, the Appellant explained that teachers have access to the Infinite Campus platform,

which is structured in a way that allows them to enter attendance by clicking on set options rather than manually entering the data as the Google document required. There was no discussion of IEP Direct during the first meeting. (R1605-R1606)

The second meeting, held around late March 2021, was disciplinary in nature. Again, Ms. Brooks and Mr. Brancato attended, along with Appellant and her union representative. Again, the Google attendance document was discussed, and Appellant was directed to complete the document line-by-line. The Appellant was also directed to complete attendance in IEP Direct. However, they did not prioritize IEP Direct. In the March 18 to 24 time frame, the Appellant completed the Google Sheets, and the information was inputted but not in the format that Brancato had wanted. Moreover, the Appellant accessed the system to complete progress reports as well as document therapy sessions. Orwick claimed that she ran a report that confirmed that Appellant was infrequently accessing the system and adding data, citing an example that Appellant first accessed IEP Direct for student No. 222300 on October 20, 2020, and made five entries and did not access the system again for this student until March 1, 2021, when Appellant made one entry. The Appellant accessed the system to complete progress reports as well as document therapy sessions. The Appellant challenged the veracity of the IEP Direct as that document can be easily amended, and that simply is not possible. (R1606)

Please note that this District was billing Medicaid for assigning homework to

students remotely, and the students would complete the assignment on their own time. There was absolutely no instruction or supervision, just a homework assignment, but the students would be marked present as if there were instructions provided and Medicaid was billed. (R1606). Appellant believes this was improper and possibly Medicaid fraud sanctioned by the District.

Following that meeting, Appellant did her best to comply with the directives. Appellant completed the Google document line-by-line and brought IEP Direct current. She worked after hours and sometimes late into the evening. By the end of the school year Appellant completed Google Sheets and had about 95-98 percent of IEP direct completed. (R1607)

On or about April 5, 2021, Appellant was given a letter detailing the administration's expectations of her going forward. The letter purportedly serves as the District's 45-day notice required by the Settlement Agreement and memorializes the discussion held at a March 17, 2021, meeting with her. In response to the letter, Appellant continued to work to satisfy the directives to the best of her ability. Appellant prioritized the Google document as, based on what the administration had stressed during the meetings, she felt this was the most important. No one ever explained what item should be prioritized. However, the Google document appears first in the bulleted list of "outstanding matters." (R1607)

A final meeting was held on June 10, 2021. In attendance were Appellant,

Janet Orwick, Ms. Brooks, and Stacy Moran, president of the local union and Appellant's union representative. The meeting went over the letter dated April 5, 2021, and its directives. Appellant invoked her Cadet rights and did not answer any questions. Following that meeting, Appellant continued to complete her duties as a Speech and Language Pathologist with the District to the best of her ability. Appellant did her absolute best to bring both platforms current, but given her job responsibilities coupled with all the additional duties assigned to her, it was impossible to complete until the end of the school year. (R1607)

## E.    The 3020-a Proceeding

On or about June 24, 2021, Appellant was served with 3020A charges in an attempt to terminate her due to her race. A 3020a hearing was held, and on May 9, 2022, a decision terminating Appellant was issued. The Hearing Officer held that although acknowledging the extraordinary circumstances regarding the 2020-2021 pandemic year, Appellant's failure to contemporaneously enter the information at issue in IEP Direct was a problem before the COVID-19 pandemic. While the conduct is not alleged in the charges, in this case, and there was no discipline used the uncharged and undocumented alleged issue is justification for the challenges that were undermined and presented by the COVID-19 pandemic. Thereafter, the Appellant challenged the decision in Court, and the Orange County Supreme Court vacated the 3020-a decision.  (R1607-R1608)

Appellant was the only speech therapist in the entire district who had to utilize the Google platform and the only African-American speech therapist working for Respondent. To the best of Ms. O'Neill's knowledge, she was the only speech therapist and service provider who had to cover classes, who had hall duty and supervisor duties. Further, Appellant was the only traveling service provider that had any additional duties. In addition, she was required to mentor a speech therapist for five months, attesting to her competency as a speech and language pathologist. (R1608-R1609)

Despite the fact that Bracato was told the IEP Direct was the only platform necessary for taking attendance, Brancato still insisted on both platforms being required and deliberately failed to tell Appellant that he only needed to complete IEP Direct, according to the Director of Special Education for the entire district. (R1608-R1609)

On or about May 9, 2022, Appellant was terminated due to her race (African-American). (R1609)

In sum, During the 2020-2021 school year in issue, the District's disparate treatment between the Appellant and other Traveling District Therapists ("TDT") grew even more significant, including that she was the only TDT required to cover other classes when other teachers were absent, to perform hall duty, mentor another therapist(s) and other supervisory responsibilities. Appellant was the only TDT

during the 2020-2021 school year who was required to document services performed and student attendance on both the "IEP Direct" and "Google Attendance" Platforms, notwithstanding that (i) Google Attendance recording was particularly arduous and time-consuming; (ii) the District's Head of Special Education, Janet Orwick ("Orwick") directed that only platform necessary for attendance purposes was the IEP Direct ; (iii) that Orwick so advised Assistant Vice Principal, Vincent Brancato ("Brancato"), who notwithstanding that directive, ordered Appellant to complete both Platforms and to do so retroactively to the commencement of the school year in September 2020; and (iv) no other speech and language pathologist was required to do so. (R1609-R1610)

Appellant also denies the accuracy of the IEP Reports run by Orwick because these reports do not pull from the "Student Not Available" data field. The reports were generated within a certain amount of time, did not include any information run after 5 PM, and included errors. This was brought to Orwick's attention, and she did not provide an updated, valid report to any other meeting. The IEP report also included several errors. Moreover, several of the reports were run prior to the 45 school day time. No other therapist was followed as closely and scrutinized to the best of her knowledge over documentation to the point that their IEP direct information was monitored. (R1610)

There was sufficient evidence using both Google Forms and other Google

Classroom timestamped documents, in addition to the attendance form and teachers' notes in Infinite Campus, that students were seen for therapy. In addition to corroborating Google Classroom information and communications, both administrators and other classroom teachers had real-time access to the Google Classroom. (R1610)

**F.    The Supreme Court's Order of February 24, 2023**

Appellant moved in the Orange County Supreme Court, pursuant to Articles 75 and 78 of the CPLR, to vacate or remand the 3020-a Decision. (R1607-R1608; R1616).

By Decision and Order dated February 24, 2023 ("February 24, 2023, Order") (R1616), the Supreme Court granted Appellant's application and vacated the Arbitration Award and Appellant's termination, finding *inter alia* that:

Ms. O'Neill's charges are based on her failure to contemporaneously complete speech session logs and/or IEP direct service logs. The Hearing Officer relied on the testimony of Director Orwick, who introduced a report that Director Orwick created herself from the IED Direct/Frontline system that the school utilizes for tracking services. The report was entitled RS Attendance Summary and was created by selecting Ms. O'Neill's name, date range, and service type of speech. The report only shows sessions that are considered to be recorded units. Ms. O'Neill testified that this report is not an accurate record of sessions that she provided during the 2020-

2021 school year. Ms. O'Neill testified that if a student was attending remotely and had not completed a consent form, the student would be marked as "student not available" in the IEP system, even though she provided the service. The sessions that were marked as "student not available" are not included in the RAS Attendance Summary. Due to the Covid pandemic, all of her students attended remotely. Ms. O'Neill stated that she received only seven or eight consent forms back, out of 52 students. Ms. O'Neill submitted evidence of logs entitled Summary of Related Service Session Notes, consisting of 143 pages, showing her session notes for the completed services. Ms. O'Neill testified that these session notes were entered into the IEP system around the time the service was provided. (R1222-R1245)

The Hearing Officer stated that he considered these claims by Ms. O'Neill and found that they were not supported by the "totality of the documents" presented by the District. The Hearing Officer relied on the number of documents in evidence rather than the substance of the documents. The Hearing Officer fails to state how he resolved Ms. O'Neill's contentions that Director Orwick's report did not accurately reflect what Ms. O'Neill entered into the IEP system. Since the Hearing Officer disregarded facts presented by Ms. O'Neill, his decision is arbitrary and capricious. (R1622-R1623)

The 2020-2021 school year was during the beginning of the COVID-19 pandemic. COVID was an unanticipated event, and the working conditions it caused

could not have been foreseen. The classes during the 2020-2021 school year were being held remotely or as a hybrid in-person/remote for the first time. Since the classes were being held remotely, the assistant principal, Vincent Brancato, instituted a requirement that a Google attendance document had to be completed, which was in addition to logging attendance into the IEP system. This task had not been a requirement prior to COVID. During this time, Ms. O'Neill was also often asked to cover classes, hall duty, and supervisory duties for teachers who were out due to COVID-19. Often, Ms. O'Neill would be notified at the last minute to cover for another class and would have to rearrange her scheduled sessions. The amount of her daily work doubled during COVID-19. She was required to keep attendance in multiple formats, conduct therapy sessions, attend IEP meetings, and write IEPs, evaluations, and coverages. An additional task that she was given was to mentor another speech therapist. Ms. O'Neill stated that she assisted the speech therapist at another school for approximately five months. Prior to COVID-19, Ms. O'Neill was allowed a 45-minute prep time each day and given a lunch break every day. During Covid, Ms. O'Neill worked through her prep time, lunch breaks, and after hours in attempts to keep up with all of her work. The unforeseen challenges due to COVID-19 and the additional duties that were given to Ms. O'Neill made performance under the Last Change Agreement impossible. (R1622-R1623)

Ms. O'Neill also contends that the circumstances were not "substantially

similar" as defined under the Last Chance Agreement to trigger the penalty. Under her Last Chance agreement, if "she is determined by the appointed hearing officer to have engaged in neglect of duty substantially similar" to her charges in her previous case of not accurately documenting speech services, the penalty will be termination from her employment. The circumstances of her prior case relating to the 2016-2017 and 2017-2018 school years could not have been substantially similar to the circumstances during the 2020- 2021 school year due to Covid. The documenting process for the speech sessions during COVID-19 was different than prior years. The additional duties and workload created by Covid were not substantially similar to her work duties when she entered into the Last Chance Agreement in 2019. (R1623)

In Footnote 1, it was noted that "1 Ms. O'Neill was the only speech pathologist in the district required to complete the Google attendance document and as a result was the subject of a grievance filed by her union." (R1622)

The Hearing Officer stated that the contention that the "extraordinary circumstances" created by Covid "is compelling and might have served as grounds to justify finding the circumstances in this case were different." The Hearing Officer then considers Ms. O'Neill's past conduct of failing to properly document her sessions, including in January 2020, to discount Ms. O'Neill's compelling contention. However, Ms. O'Neill's past performance prior to COVID-19 cannot

determine the circumstances of the current charges for the 2020-2021 school year. (R1624)

Arbitrators may overturn discharges under last-chance agreements where they are persuaded that enforcing the agreement would be unfair under the circumstances (*see* Matter of the Arbitration-citations omitted.)

Enforcing the exact terms of the Last Chance Agreement would be unfair given the extraordinary circumstances imposed by the COVID pandemic, which could not possibly have been foreseen when Ms. O'Neill entered into the agreement in 2019. (R1624-R1625)

By finding Ms. O'Neill guilty of conduct that she was not charged with and using this information to support her termination, Ms. O'Neill's due process rights were violated (see Abramovich v Board of Ed. of Ed. Of Cent. Sch. Dist. No. 1 of Towns of Brookhaven & Smithtown, 91 Misc. 2d 481, 485 [Suffolk County 1977] aff'd 46 NY2d 450 [2d Dept 1979) (R1626)

Here, Ms. O'Neill's conduct is not analogous to offenses of corporal punishment, moral turpitude, or cheating to invoke the penalty of termination. Ms. O'Neill was only charged with failure to bring her record-keeping logs current. During this time, she performed all of her teaching duties as she has for the past nineteen years. She has never been disciplined for failing to provide speech services to her students. Considering all of the relevant factors, especially the working

conditions during COVID-19, the penalty of termination is shocking to this Court. (R1627)

Since the parties were subject to compulsory arbitration, the award must have "evidentiary support and cannot be arbitrary and capricious, and it must be in accord with due process" (Powell v New York City Dep't of Educ., 144 AD3d 920 921 [2d Dept 2016] [internal quotation marks omitted]; Matter of Denhoff v. Mamaroneck Union Free Sch. Dist., 101 AD3d 997, 997-998 [2d Dept 20121]). The Hearing Officer's award was not supported by evidentiary support, was arbitrary and capricious, and was not in accord with due process. (R1628)

## G.     The District Court Summary Judgment Decision

The District Court held Brooks' deposition testimony does not support an inference of discrimination against Plaintiff. While Ms. Brooks testified that she believes the District discriminated against her based on her race and gender by not increasing her pay "according to a scale of others" even though it increased her "responsibilities compared to others," she did not offer specifics as to the basis for this contention nor did she express a belief that Plaintiff was similarly discriminated against. (R765-R766). As a result, her statements do not constitute evidence of discriminatory motive against Plaintiff. (Citations Omitted)

In addition, Ms. Brooks is also African American, which "undercuts Plaintiff's efforts to contend that there are disputed issues of material fact concerning

her ability to prove a prima facie case of discrimination (Citations Omitted). Thus, Ms. Brooks' testimony about her own experience with discrimination does not give rise to an inference of discrimination against Plaintiff. (R768-R769)

Plaintiff also notes that she was the only African American speech therapist in the District, but this is a disparate treatment case, not a disparate impact case, so statistical data alone is insufficient to establish an inference of discrimination. Thus, a reasonable jury could not find that speech therapists at other schools in the District are proper comparators because they had different supervisors, and Plaintiff's supervisor, Mr. Brancato, was the person who imposed the new Google Spreadsheet requirement. The fact that Mr. Brancato introduced the Google Spreadsheet during the 2020-2021 school year, even though Plaintiff was allegedly already recording attendance through IEP Direct and had an unsustainable increase in responsibility due to the pandemic, is insufficient to raise an inference of discrimination since he was new to the position. (R769-R770). Accordingly, Plaintiff has failed to establish a prima facie case of race discrimination under Title VII. (R774)

The Court also held that Collateral estoppel does not apply because the issues in the two proceedings are not identical. In the Orange County Court case, Plaintiff argued that the hearing officer's decision "was not supported by substantive evidence and was arbitrary and capricious, violated due process, and the penalty in light of the circumstances is shocking to one's sense of fairness." (R34) At 5

Collateral estoppel is inapplicable on this basis alone. As a result, by stating that Plaintiff was fired because she failed to update IEP Direct during the 2020-2021 school year, not due to her race, Defendant has satisfied its burden of articulation. (R777)

However, again, Plaintiff cites only her own testimony to support this allegation and ignores (1) the testimony from Ms. Orwick that "both student not available and student absent are the data" included in the "student absence field and (2) e-mails from the IEP Direct vendor confirming that "Student Absence," "Provider Absence," "Student Not Available," and "Provider Not Available" were included "in the Student Absence and Provider Absence columns on the report. Further, the IEP Direct session notes submitted for students who had submitted teletherapy consent forms show that in many cases, Plaintiff continued to mark them as not available anyway. The plaintiff's argument also overlooks a key point: even if the reports were inaccurate, that alone is not sufficient to establish a pretext— Plaintiff must also prove that the real reason she was fired was because of her race. (R43)

The Court also held that Ms. O'Neill's argument that Mr. Brancato could have just used IEP Direct records to obtain the attendance information sought is misleading, since Plaintiff admits she also failed to keep those records current. Nor does the District's decision to direct Mr. Brancato to cease using Google Spreadsheet

make his prior introduction of it pretextual—new supervisors are allowed to create novel assignments and programs that differ from prior supervisors. (R43-R44)

Finally, the Court below held that the Last Chance Provision allowed Ms. O'Neill to be terminated either for conduct "substantially similar" to prior misconduct or for an entirely new "failure to accurately and contemporaneously document. Therefore, the Last Chance Provision did not limit the District to terminating Plaintiff solely based on conduct that was "substantially similar" to misconduct she confessed to in the Stipulation. Third, Ms. O'Neill's argument that by waiving any additional charges or claims based on her prior misconduct in the Stipulation, the District was prohibited from considering that prior misconduct in deciding whether she violated the Last Chance Provision in 2020-2021 reads conditions into the agreement that do not exist. The Stipulation only states that the parties were waiving prior "claims, charges, suits, etc." as of the effective date, not that they were erasing it from their memory entirely. (R45)

The Court then held that the proffered interpretation renders the "substantially similar" clause that she relies on in her other argument entirely meaningless because the District would not be able to compare her current misconduct to prior misconduct. Since "[t]he rules of contract construction require [the Court] to adopt an interpretation which gives meaning to every provision of the contract," Plaintiff's interpretation must be rejected. The Court concluded that she

failed to submit admissible evidence buttressing her novel reading of the Stipulation. Consequently, she has failed to sustain her burden and raise a genuine issue of material fact for trial. Accordingly, Defendant's motion to dismiss Plaintiff's Title VII claim is granted. (R4)

## H.    Testimony of Principal Brooks

Principal Brooks, who was the principal during the school year in which the Appellant was terminated, testified that she (Brooks) was a victim of District discrimination based on her race (R764). In this regard, Brooks testified that she had substantially greater responsibilities than other Caucasians. "Well, I think it's not just race. It could be gender as well. And I believe it was a district office in general. Not just one specific person. Lack of increase of pay according to a scale of others. Increase in responsibilities compared to others.") (R765). Brooks further testified that "I had more responsibilities than other counterparts. Providing a school comprehensive improvement plan. Providing data and presentations in quotations called datacom that required me to do extremely – an extreme amount of work additional to being just the principal in the building." (R765) (This is similar to what Appellant is alleging.)

Principal Brooks testified that it was Brancato who was responsible for increasing Appellant's job duties and responsibilities, including Appellant's schedule regarding class coverage for absent teachers, hall coverage, etc. (R788).

Brooks further testified that it was Brancato who mandated that Google Attendance be completed, notwithstanding the existence of the IES Platform (R790), that other than Appellant, Brooks could not identify any other speech therapist who was required to complete Google Attendance in addition to IES Direct, much less complete it retroactively to the start of the 2020-2021 school year as Appellant was directed to do by Brancato (R795). Brooks further testified that Appellant was offered no assistance to help her get current with the two attendance platforms that she was directed at completing. (R843). Brooks testified that the District stopped using Google Attendance before the start of the 2022 school year. (R826).

Brooks did not testify at Miss O'Neill's 3020-a hearing. Prior to the pandemic, a speech therapist documented the attendance of her students in sessions through IEP Direct, and they also had their own records of it. (R771) Brooks acknowledged that Ms. O'Neill was asked to cover classes regarding teachers who were absent (R779); she was also assigned hall duty (R782). Brancato was responsible for O'Neill's schedule, including covering classes and hall duty and things of that nature (R786-R787) Brancato created the additional platform. (R790)

Other than Miss O'Neill, Brooks did not know the name of one single speech pathologist who was required to complete the Google attendance document for each child and to complete it retroactively to the start of the 2021 school year. (R795)

Regarding Ms. O'Neill's termination, Principal Brooks' only role was to

transmit the information that has been documented in connection with Miss O'Neill. The decision to move forward on the 3020-a was made by the Superintendent or HR or a combination of the two. Principal Brook did not recommend termination or have any recommendation (R803)

Brooks did not know why the school stopped using the Google platform and who made the decision to stop using it (R826), and the replacement was hired who was Caucasian (R827)

Brooks acknowledged that O'Neill was required to keep attendance in multiple formats, provide speech therapy, attend IEP meetings, write her portion of the IEPs, conduct evaluations, cover classes, and have hall duty. She seemed to acknowledge that she also had to mentor another speech therapist for five months. (R829, R830).   Brooks also stated that she did not offer O'Neill any specific assistance (R843).

## I.    Testimony of Special Education Director Orwick

Regarding Medicaid billing, if a student was remote, that student was given an assignment similar to a homework assignment, did their homework assignment, and that would count as being present. (R951-R952)

Orwick (R940) testified that at the time the 2019 Last Chance Agreement was negotiated, the Appellant had complained vigorously about the size of her student caseload. (R929; R945); that it was Brancato who directed Appellant to complete

Google Attendance, notwithstanding that she (Orwick) specifically advised Brancato that all attendance and session notes should be imputed into IEP Direct and that IEP Direct would serve as the applicable attendance platform for District's Speech Therapists (R947-R948). In fact, Orwick told Brancato that if O'Neill had completed her notes in IEP Direct, that would have sufficed. (R955-R956; R970; R971).

Orwick acknowledged that O'Neill was required to cover classes (R950) and that her caseload in 2021 was between 47 and 55 students (R951-R952), and that she (Orwick) was aware that the Appellant was having difficulty getting parents to sign the District's consent form (R957).

Orwick acknowledged that Mr. Brancato had asked Ms. O'Neill to input her attendance into a Google form of some sort. When he approached Orwick about that, she indicated that all of her attendance and session notes should be in Frontline IEP Direct. Orwick's stance with him and with Ms. O'Neill was and continued to be that her notes in IEP Direct would serve as attendance. (R947-R948) Orwick did not know whether or not, in addition to the IEP Direct, O'Neill was also required to utilize the Google Direct platform or a platform that Google developed regarding attendance. "I don't know anything about an attendance platform within Google." (R949)

Orwick emphasized that she told Mr. Brancato that if O'Neill were to

complete her notes in IEP Direct Frontline, that would suffice as attendance. When asked: "Did you ever tell her at that meeting, listen, there's two platforms, the important one is the IEP Direct, get that done, if you can get the other one done great, but at least get the IEP direct done? ANS: I don't recall what was said at that meeting. So, my understanding was she had to complete the IEP Direct, if she had done that, okay, that would have suffice for attendance purposes, correct? That is what I told Mr. Brancato. Yes. (R955-R956)

The other speech and language therapists at Newburgh documented their services in the IEP Direct platform. (R969) No other platform was required for the speech and language therapists other than IEP Direct (except Ms. O'Neill). (R969, R971)

## J.    Testimony of Christianne Pryne and Linda Catalusci

Ms. Pryne, a Caucasian occupational therapist employed by the District, testified that she had approximately 25 students assigned to her during the 2020-2021 COVID school year (R666) and that the District stopped using Google Attendance at the end of the 2020-2021 school year (R670) and that she was not asked to cover classes or to perform any hall supervision duty during the 2020-2021 school year. (R672). Catalusci, a traveling physical therapist employed by the District, testified that during COVID, she had no class coverage, hallway, or supervisory responsibilities (R1009; R1011), that reporting attendance was

effectuated only through IEP Direct, that she did not and was not required to use Google Attendance. (R1011), and that while parent consent forms were required, someone else in the District's Special Education Department actually transmitted those forms to parents. (R1015; R1016; R1017).

Catalusci's responsibilities were limited to servicing students and providing them with physical therapy services only, and she used IEP directly. (R1009, R1011) She did not recall any other African-American speech and language pathologist (R1012) Ms. Catalusci, at any point in her career as a physical therapist for Newburgh, was never assigned to cover classes when teachers were out for COVID and was never assigned hallway duty. (R1015)

Unlike Ms. O'Neill, who had that responsibility during the COVID period when some students attended virtually, the Telehealth Consent Forms for physical therapy were not sent by the therapist; it was not their responsibility. Someone from the Special Education Department sent out the consent forms; it was not the therapist's responsibility. (R1015, R1016, R1017)

## K.    Testimony of Brancato

Brancato, who was responsible for attendance, could not recall when they stopped using the Google platform.  The testimony at his deposition was the following: "Well, when you left, I think you said in November of 2021, correct? Yes. Was it being utilized in November of 2021? It may have been.  I would have to

research that. I don't recall at this moment. I haven't thought about the Google sheet and attendance for a while now. Well, your responsibilities in the fall of 2021 included attendance, correct? Yes. And you don't recall at the moment whether or not the '21, at least at the beginning of the 21-22 school year before you changed jobs in November of 2021, you don't recall whether or not that platform was being utilized? As previously stated, I don't recall. I would have to check my records." (R536-R537)

Despite being AP, he did not know if Ms. O'Neill had to cover classes and had hall duty, but he stated that no service providers had hall duty. (R582) He did not know whether Ms. O'Neill had mentoring responsibilities. (R583) He also stated that he did not know if she had responsibilities for annual review, CSC meetings, and speech and language testing. (R600)

Asynchronous is when, in essence, an assignment is given to a student or in a service provider context, and that student does the work not in that timeframe when the therapy is given but outside of that timeframe. (R584). He was not sure if that was one of Ms. O'Neill's complaints that a student shouldn't be accounted for as present if a service is provided by an asynchronous (R585). He clarified his answer by stating that he does not know about IEP Direct. In the context of Infinite Campus, if she put it on the sheet, we would absolutely have it logged in the Infinite Campus System. (R594)

For the 2020 to 2021 school year for teachers and related service providers, if a student submitted an assignment for an asynchronous class, they would be counted as present for that class (R601; R602). So if a student was not present remotely or in person, was given a homework assignment, and completed the homework assignment, that person would be marked present (R618, R619). If they were absent from class and didn't do an assignment, they would be marked absent. (R620)

## SUMMARY OF THE ARGUMENT

The District Court erred in granting Appellees' Motions for Summary Judgment when the facts viewed in the light most favorable to the Appellant established for the following reasons.

The District's conduct towards Appellant during the 2020-2021 school COVID year must properly be viewed in the context of the District having a long history of treating Appellant in ways that not only violated New York law but refused to provide her with privileges, conditions, and accommodations that the District provided similarly situated peers, including grossly excessive workloads, school transfers, inappropriate scrutiny, and refusal of reasonable child care accommodations. (R55-R56)

During the 2020-2021 COVID school year, the District's disparate treatment of Appellant grew dramatically more severe, including that Appellant was treated substantially differently than similarly situated colleagues, including that Appellant

was: (i) unlike other Caucasian Speech Therapist and Traveling Service Providers, required to cover other classes when other teachers were absent, perform hall duty and other supervisory responsibilities, and mentor staff (ii) required by Brancato to document student attendance and services performed using both IEP Direct and Google Attendance and to do so retroactively from September 2020, notwithstanding that the foregoing was an extraordinarily arduous and time-consuming task during extraordinary times at the height of the pandemic, and that IES Direct was the only Platform required by the Special Education Director Orwick and the Special Education Department and that Appellant was never advised of the same. In fact, no one told the Appellant, and she was led to believe both were critical and that the new attendance platform was more important and required for attendance purposes. (R56)

As a result of the foregoing, the Appellant's daily workload doubled during COVID-19, resulting in Ms. O'Neill frequently working through her prep time, lunch breaks, and after-hours to keep up with all of her work. The extraordinary circumstances of a once-in-a-century pandemic made performance under the Last Chance Agreement effectively impossible. The Orange County Supreme Court specifically found the finding of impossibility. (R36; R63)

Appellee may argue that the Appellant has no evidence that Brancato introduced the Google Attendance job duty due to the Appellant's race, and it is

insufficient to simply speculate so. This is particularly true since Brancato was relatively new to his position and entitled to change job duties/create his own agenda. This logic was adopted by the District Court almost verbatim from Appellee's brief. In fact, it is Appellant's position that Brancato's insistence that Appellant must complete both platforms, given the enormity of her workload and other responsibilities, his demand that Google Attendance be inputted retroactively to September 2020, Appellant's several requests that she be relieved of Google Attendance inputting given her overall workload and responsibilities and Orwick's (Director of Special Education) testimony as specifically communicated to Brancato that Google Attendance was not the requisite platform to be used by the Special Education Department and that IEP direct suffices for attendance purposes, raises a bona fide issue of fact regarding whether Brancato's insistence of requiring both platforms and actually prioritizing the Google platform was in fact motivated at least in part by racial animus.

For these reasons, a full reversal should be granted.

# ARGUMENT

## POINT I

### THE APPROPRIATE STANDARD OF REVIEW OF A GRANTING OF A MOTION FOR SUMMARY JUDGMENT IS A DE NOVO REVIEW OF THE RECORD

The standard of review of a motion for summary judgment is de novo. <u>Mario v. P&C Food Markets, Inc.</u>, 313 F.3d 758, 763 (2d Cir. 2002). On a motion for summary judgment, all factual inferences must be drawn in favor of the non-moving party. <u>Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.</u>, 192 F.3d 337, 343 (2d Cir. 1999). Summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Id. It is well established that credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...[in] ruling on a motion for summary judgment. <u>Anderson v. Liberty Lobby, Inc</u>., supra, 477 US at 2242, 255 (1986). Ordinarily, the Appellant's evidence establishing a prima facie case and the defendant's production of a nondiscriminatory reason for the employment action raises a question of fact to be resolved by the factfinder after a trial. <u>Cronin v. Aetna Life Ins. Co</u>., 46 F.3d 196, 203 (2d Cir. 1995). Summary judgment is appropriate at this point only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact.

In connection with a motion for summary judgment, the Court's function is to determine whether a material factual issue exists, not to resolve any existing factual issues. United States v. Diebold Inc., 369 U.S. 654 (1962). Where, as here, the non-movant bears the ultimate burden to prove at trial that Defendant retaliated, she may defeat the summary judgment motion by procuring sufficient specific facts to establish that there is a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material facts. Matushita Electric Industrial Co. v. Zenith Radio Corp., 475 US 574, 586-87, 106 S.Ct. 1328, 1355-56, 89 L.Ed. 2d 538 (1086); Summary judgment is proper only when, "viewing the evidence in the light most favorable to the non-movant, the court can determine that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Weg v. Macchiarola, 995 F.2d 15, 18 (2d Cir.1993). The Court must resolve all ambiguities and draw all doubtful inferences against the moving parties. Trans-Orient Marine Corp v. Star Trading & Marine, Inc., 925 F.2d 566, 572 (2d Cir.1991).

## POINT II

## THE APPELLEE IS COLLATERALLY ESTOPPED FROM ASSERTING IT HAD LEGITIMATE REASONS FOR APPELLANT'S TERMINATION

Parties may be estopped from litigating determinations on issues made in prior actions. The determination may be an issue of fact or an issue of law. Preclusion requires that the issue was decided as part of a valid Decision and Order. Valid final judgments of state courts are given preclusive effect in other state and federal courts under the Full Faith and Credit Clause of the U.S. Constitution. "Under New York law, collateral estoppel will preclude a federal court from deciding an issue if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." Reddy v. Catone, 630 Fed. Appx. 120, 121 (2d Cir. 2015) (summary order) (quoting McKithen v. Brown, 481 F.3d 89, 105 (2d Cir. 2007); see also Curry v. City of Syracuse, 316 F.3d 324, 331 (2d Cir. 2003) ("[C]ollateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication." (citation and internal quotation marks omitted). "Collateral estoppel…is grounded on concepts of fairness and should not be rigidly or mechanically applied." D'Arata v. New York Cent. Mut. Fire Ins. Co., 76 N.Y.2d 659, 664, 564 N.E.2d 634, 563 N.Y.S.2d 24 (1990). "The rule in New York is that the 'pendency of an appeal does not prevent the use of the challenged judgment as the basis of' collateral estoppel." 77 Water St., Inc. v. JTC Painting & Decorating,

148 A.D.3d 1092, 1095, 50 N.Y.S.3d 471 (2d Dep't 2017) (quoting <u>Anonymous v.</u>

<u>Dobbs Ferry Union Free Sch. Dist.</u>, 19 A.D.3d 522, 522, 797 N.Y.S.2d 120 (2d Dep't

2005). "[I]t appears likely that the state court's determination that Defendants had a

legitimate reason to terminate Appellant is entitled to preclusive effect, even if

Appellant intends to appeal that decision.") (citing <u>LaFleur v. Whitman</u>, 300 F.3d

256, 272 (2d Cir. 2002) ("A judgment pursuant to Article 78 may preclude re-

litigation of issues already decided in that earlier judgment.")). (<u>Gomez v NY City</u>

<u>Dept</u>., 2022 US Dist LEXIS 146751, at *14 [SDNY Aug. 15, 2022, No. 21-CV-

01711 (AT)(SN)])

     The requirements to invoke issue preclusion under the doctrine of collateral

estoppel are well settled, to wit, a party may not relitigate in a subsequent

proceeding: (i) issue (s) clearly raised in a prior proceeding; (ii) the parties had a full

and fair opportunity to litigate the issue(s) in the prior proceeding; (iii) the issue (s)

was decided against that party … whether or not the tribunals or causes of action are

the same, and (iv) the issue decided in the prior proceeding is the same in the

subsequent proceeding. <u>LaFleur v. Whitman</u>, 300 F.3d 256, 271 (2d Cir. 2002)

(quoting <u>Ryan v. New York, Tel. Co.</u>, 62 N.Y. 2d 494, 500 (478 N.Y.S.2d 823

(1984).

     Specifically, the "central" issue in the Arbitration Proceeding was whether

Appellant, during the 2020-2021 school year had neglected her duty and/or was

incompetent and performed conduct unbecoming of a professional and was insubordinate by failing to contemporaneously complete speech session logs and/or IEP direct service logs The Orange County Supreme Court, in vacating the arbitration award held in the February 24, 2023 Order that Appellant had not neglected her responsibilities, holding that there was no basis for arguing that the Last Chance Provision had been violated because the classes during the 2020-2021 school year were being held remotely or as a hybrid in-person/remote for the first time. Since the classes were being held remotely, the assistant principal, Vincent Brancato, instituted a requirement that a Google attendance document had to be completed, which was in addition to logging attendance into the IEP system; this task had not been a requirement prior to COVID-19.

The Court also found that the Appellant also had to cover classes, hall duty, and supervisory duties for teachers who were out due to COVID-19. Ms. O'Neill was often asked to cover classes due to COVID-19 during this time. Often, Ms. O'Neill would be notified at the last minute to cover for another class and would have to rearrange her scheduled sessions. The amount of her daily work doubled during COVID-19. She was required to keep attendance in multiple formats, conduct therapy sessions, attend IEP meetings, and write IEPs, evaluations, and coverages. An additional task that she was given was to mentor another speech therapist. Ms. O'Neill stated that she assisted the speech therapist at another school for

approximately five months. Prior to COVID-19, Ms. O'Neill was allowed 45-minute prep time each day and given a lunch break every day. During COVID-19, Ms. O'Neill worked through her prep time, lunch breaks, and after-hours in an attempt to keep up with all of her work. The Court found that the unforeseen challenges due to COVID-19 and the additional duties given to Ms. O'Neill made performance under the Last Change Agreement impossible.

The Court below committed a fundamental error and held that since the issue of race was not raised in the 3020-a hearing, the findings were not applicable. However, the Court failed to address that the factual issues necessary to decide the 3020-a hearing are the same as those presented in the case at bar. The Court ruling now conflicts directly with the finding of the Orange County Supreme Court.

Here, of course, the issue of whether there was a legitimate reason for Appellant's termination based on violating the last chance agreement has been decided and cannot be relitigated. The only issue remaining for the Court is whether there is a factual dispute on the issue of discriminatory intent. As stated below, there is a plethora of record evidence of discriminatory intent in which a reasonable jury can conclude that race was, in part, a motivating factor.

## POINT III

**THERE WERE MATERIAL FACTUAL ISSUES WITH RESPECT TO WHETHER RACIAL *ANIMUS* PLAYED A ROLE IN APPELLANT'S TERMINATION**

Regarding the federal claim[1], Appellant has pleaded sufficient facts to establish a prima facie case of discrimination. Appellant is a member of a protected class, that she was qualified for her position, and that her employment termination constituted an adverse act. (DB, page 13). The termination is actionable if the Appellant can show that the termination decision was motivated at least in part by an impermissible reason, *to wit*, a discriminatory reason *(Id.)*, and that an impermissible motivation can be established either through direct evidence of an intent to discriminate or indirectly, by showing circumstances giving rise to an inference of discrimination.

Appellant can also show an inference of discrimination based upon an employer's preferential treatment towards a similarly situated employee outside of the Appellant's protected class. Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003). An employee is similarly situated when the alleged comparator(s) and the claimant are similar enough "to support at least a minimal inference that the difference of treatment may be attributable to discrimination." McGuinness v.

---

[1] The District Court dismissed the New York State Human Rights law claim without prejudice by not exercising the supplemental jurisdiction of the Court over the State Law claim.

Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001)

**A.    The Totality of the Circumstances Here Give Rise To An Inference of Discrimination**

It is respectfully asserted that given the foregoing threshold standards in making out a *prima facie* case in opposing a summary judgment motion, the facts and circumstances presented in Appellant's Declaration, and the referenced non-party deposition testimony, there is a genuine issue of fact as to whether Appellant's termination was at least in part a result of racial *animus*.

**First,** Principal Brooks testified that, in her opinion, the District had discriminated against her based on her race (African-American) during the time period relevant here.  Accordingly, Appellant's contention of racial *animus* based upon the facts alleged in Appellant's Declaration and the other cited nonparty testimony should be viewed in the context that it is not the first time that the District has been charged with acting in a racially tortious way.  Further, she alleged similar conduct to wit, being given a greater amount of work than her peers.

**Second,** the District's conduct towards Appellant during the 2020-2021 school COVID year must properly be viewed in the context of the District having a long history of treating Appellant in ways that not only violated New York law but in refusing to provide her with privileges, conditions, and accommodations that the District provided similarly situated peers, including grossly excessive workloads, school transfers, inappropriate scrutiny, and refusal of reasonable child care

accommodations ).

**Third**, during the 2020-2021 COVID school year, the District's disparate treatment of Appellant grew dramatically more severe, including that Appellant was treated substantially differently than similarly situated colleagues, including that Appellant was (i) unlike other Caucasian Speech Therapists and Traveling Service Providers, Appellant was required to cover other classes when other teachers were absent, perform hall duty and other supervisory responsibilities, and mentor staff (Pl. Decl. ¶50) ; (ii) required by Brancato to document student attendance and services performed using both IEP Direct and Google Attendance and to do so retroactively from September 2020, (notwithstanding that once in a century pandemic) was extraordinarily arduous and time- consuming task and that IES Direct was the only Platform required by the Special Education Director Orwick and the Special Education Department (R1609; R954, R956) and that Appellant was never advised that only the IES Direct platform was required (R1609). In fact, no one told the Appellant, and she was led to believe both platforms were critical and that the new attendance platform was more important and required for attendance purposes.

**Fourth**, as a result of the foregoing, the Appellant's daily workload doubled during COVID, and she was compelled to work through her prep time, lunch breaks, and after-hours to keep up with all of her work as specifically held by the Supreme Court made performance under the Last Chance Agreement effectively impossible.

(R695; R1242)

**Fifth**, the circumstances regarding the last chance agreement and the pandemic year were not similar. (R45)

## B.  Defendant's Baseless Assertions

The Appellee may argue, and the Court below found that Principal Brooks, who is African American, issued the counseling memorandum. However, the Cat's Paw theory was adopted in New York to protect employees in the exact circumstances and addresses how prejudice and stereotypes infect and operate. "The Supreme Court considered the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make the ultimate employment decision." Staub v. Proctor Hosp., 131 S. Ct. 1186, 1189 (2011). The Court concluded that, "if a supervisor performs an act motivated by the [discriminatory or retaliatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable" under applicable nondiscrimination law.

The employer is also liable if one or more decision-makers were manipulated by a coworker with a discriminatory or retaliatory motive into taking an adverse employment action against an employee. In Vasquez v. Empress Ambulance Service, Inc., F.3D-No. 15-3239 (2d Cir. Aug. 29, 2016), this Court ruled that

employers may be liable for unlawful discrimination when they discharge an employee based on manipulation by a manager who has a discriminatory motive, even if the decision-makers were unbiased. Vasquez was able to pursue a claim that Empress had unlawfully retaliated against her in violation of Title VII by terminating her employment because she had raised a complaint of sexual harassment and subsequently, the manager or assigned investigator failed to affirmatively investigate discriminatory/retaliatory conduct in the workplace. "An employer may be held liable for an employee's animus under a "cat's paw" theory, regardless of the employee's role within the organization, if the employer's own negligence gives effect to the employee's animus and causes the victim to suffer an adverse employment action." Vasquez., at 8-11. See also Brown v. Montefiore Med. Ctr., 168 A.D.3d 488, 92 N.Y.S.3d 217, 2019 N.Y. Slip Op. 226 (N.Y. App. Div. 2019) A race discrimination case –under Title VII. The Plaintiff, a nursing attendant who is black and of Jamaican national origin, alleged that she was terminated due to her race and national origin. One Defendant displayed discriminatory animus and played a "meaningful role" in the process, leading to the adverse employment action against the Plaintiff. The court rejected the Defendant's argument that it could not be held liable because the people who actually made the decision to terminate the plaintiff's employment did not themselves have the requisite discriminatory animus.

Here, Appellant adduced sufficient evidence that Brancato significantly influenced and set in motion a process to terminate Ms. O'Neill's employment.

At the outset, the Orange County Supreme Court has already ruled that the articulated reasons for Appellant's termination were not legitimate, and Defendants are collaterally estopped from making the arguments regarding the reasons for her termination.

Appellant disputes that she failed to document her sessions and student attendance, but only that - as already described in detail - she fell behind because of her onerous duties and responsibilities during the 2020-2021 COVID school year, including that she was required to input sessions and attendance in two different platforms. Similarly, given the circumstances of Appellant's work environment during the 2020-2021 COVID school year, there was no appropriate legal rationale to argue that Appellant's conduct triggered the application of the Last Chance Provision, and this was specifically held by the Supreme Court in its February 24, 2023 Order.

In fact, similarly, situated Caucasian peers of Appellant had nothing close to Appellant's workload and other responsibilities, and various of them were not required to input sessions and attendance in both IEP Direct and Google Attendance, much less retroactively as Appellant was required to do. Besides the fact that she was the only African-American speech therapist and was the only speech therapist

who had to document sessions on two platforms, she was the only speech therapist who had the to cover classes which took 50 minutes (she covered between 100 to 150 classes); the only speech therapist to have a supervisory duty that involved the teacher waiting in the classroom, usually about 10 to 12 minutes, so students would not be left unsupervised which totaled approximately 45 minutes out of Appellant's day (R1601) and the only speech therapist who had hall duty for about 5 to 10 minutes per day, the only traveling service provider who had to perform any of these duties (covering classes, hall duty, and supervisory duty)

Brancato's insistence that Appellant use the same given that she was already using IEP Direct, the enormity of her workload and other responsibilities, his demand that Google Attendance be inputted retroactively to September 2020, of Appellant's several requests that she be relieved of Google Attendance inputting given her overall workload and responsibilities and Orwick's sworn testimony as specifically communicated to Brancato that Google Attendance was not the requisite platform to be used by the Special Education Department and that IEP direct suffices for attendance purposes, raises a bona fide issue of fact regarding whether Brancato's *insistence* as aforesaid, was in fact motivated at least in part by racial *animus*. Evidence that the reports can be specifically customized and potentially manipulated. No one prioritized either attendance format for Appellant, and was told both were required and necessary for attendance purposes.

The District's conduct towards Appellant during the 2020-2021 school COVID year must properly be viewed in the context of the District having a long history of treating Appellant in ways that not only violated New York law but in refusing to provide her with privileges, conditions, and accommodations that the District provided similarly situated peers, including grossly excessive workloads, school transfers, inappropriate scrutiny, and refusal of reasonable child care accommodations).

During the 2020-2021 COVID school year, the District's disparate treatment of Appellant grew dramatically more severe, including that Appellant was treated substantially differently than similarly situated colleagues, including that Appellant was: (i) unlike other Caucasian Speech Therapist and Traveling Service Providers, Appellant was required to cover other classes when other teachers were absent, perform hall duty and other supervisory responsibilities, and mentor staff (ii) required by Brancato to document student attendance and services performed using both IEP Direct and Google Attendance and to do so retroactively from September 2020, notwithstanding that the foregoing was an extraordinarily arduous and time-consuming task and that IES Direct was the only Platform required by the Special Education Director Orwick and the Special Education Department and that Appellant was never advised of the same. In fact, no one told Appellant, and she was led to believe both were critical and that the new attendance platform was more

important and required for attendance purposes.

As a result of the foregoing, the Appellant's daily workload doubled during Covid, and she was compelled to work through her prep time, lunch breaks, and after-hours to keep up with all of her work as specifically held by the Supreme Court made performance under the Last Chance Agreement effectively impossible.

Appellee may argue that the Appellant has no evidence that Brancato introduced the Google Attendance job duty due to the Appellant's race, and it is insufficient to simply speculate so. This is particularly true since Brancato was relatively new to his position and entitled to change job duties/create his own agenda. This logic was adopted by the District Court almost verbatim. In fact, it is Appellant's position that Brancato's insistence that Appellant must complete both platforms the same, given that she was already using IEP Direct, the enormity of her workload and other responsibilities, his demand that Google Attendance be inputted retroactively to September 2020, Appellant's several requests that she be relieved of Google Attendance inputting given her overall workload and responsibilities and Orwick's (Director of Special Education) sworn testimony as specifically communicated to Brancato that Google Attendance was not the requisite platform to be used by the Special Education Department and that IEP direct suffices for attendance purposes, raises a bona fide issue of fact regarding whether Brancato's insistence as aforesaid, was in fact motivated at least in part by racial animus.

## **CONCLUSION**

For the reasons already enumerated in the Brief, it is respectfully asserted that Appellant has set forth a material issue fact as to whether Defendant's motivation was at least in part driven by racial animus. Based upon the foregoing, it is respectfully requested that the Decision, Order, and Judgment be vacated and remanded back to the District Court for trial and any other relief that is just and equitable.

Dated: New York, New York
     November 1, 2024          STEWART LEE KARLIN
                               LAW GROUP, P.C.

                               */s/ Stewart Lee Karlin, Esq.*
                               Stewart Lee Karlin, Esq.
                               Attorneys for Plaintiff-Appellant
                               111 John St., 22nd Floor
                               New York, NY 10038
                               (212) 792-9670

## CERTIFICATION PURSUANT TO
### Fed. R. App. P. 32(a)(7)(B) and (c)

The undersigned hereby certifies that the foregoing brief complies with the type-volume of Fed. R. App. P. 32(a)(7)(B) and (C0 because the brief contains 12,794 words of text.

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14pt.

# 24-2007

## 22-cv-5017(PMH)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

——————— »« ———————

CHRISTA O'NEILL,

*Plaintiff-Appellant,*

v.

NEWBURGH ENLARGED CITY
SCHOOL DISTRICT,

——————————     *Defendant-Respondent.*

*On Appeal from the United States District Court*
*for the Southern District of New York (New York)*

## SPECIAL APPENDIX

**STEWART LEE KARLIN**
**LAW GROUP, P.C.**

Stewart Lee Karlin, Esq.
*Attorneys for Plaintiff-Appellant*
111 John Street, 22nd Floor
New York, New York
(212) 792-9670

Reproduced On Recycled Paper

# **TABLE OF CONTENTS**

Table of Contents ................................................................................. i

SDNY Docket Report ........................................................... SA1-SA10

Opinion and Order Appealing From ...................................... SA11-SA48

Judgment ...................................................................................... SA49

28 USC § 1291 ............................................................................. SA50

28 USC § 1331 ............................................................................. SA51

28 USC § 1367 ............................................................................. SA52

Full Faith and Credit Clause .......................................................... SA53

New York State Human Rights Law ................................................ SA54

Rule 56 .............................................................................. SA55-SA64

Title VII ....................................................................................... SA65

Notice of Appeal ........................................................................... SA66

**[SA-1**]LOSED,APPEAL,ECF,MAGCONSENT,MEDTFR8

**U.S. District Court**
**Southern District of New York (White Plains)**
**CIVIL DOCKET FOR CASE #: 7:22-cv-05017-JCM**

SDNY Docket
Report [SA1-SA10]

O'Neill v. Newburgh Enlarged City School District | Date Filed: 06/15/2022
Assigned to: Magistrate Judge Judith C. McCarthy | Date Terminated: 06/26/2024
Demand: $300,000 | Jury Demand: Both
Cause: 42:2000e-2ra Job Discrimination (Race) | Nature of Suit: 442 Civil Rights: Jobs
| Jurisdiction: Federal Question

**Plaintiff**

**Christa O'Neill**                    represented by    **Natalia Mercedes Kapitonova**
                                                         Stewart Lee Karlin Law Group, P.C.
                                                         111 John Street, 22nd Floor
                                                         New York, NY 10038
                                                         212-792-9670
                                                         Fax: 212-732-4443
                                                         Email: cnk@stewartkarlin.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Stewart Lee Karlin**
                                                         Stewart Lee Karlin, Law Group PC
                                                         111 John Street 22nd Floor
                                                         New York, NY 10038
                                                         212-792-9670
                                                         Fax: 844-636-1021
                                                         Email: slk@stewartkarlin.com
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Newburgh Enlarged City School District**    represented by    **Deanna L. Collins**
                                                                Silverman & Associates
                                                                445 Hamilton Avenue
                                                                Ste 1102
                                                                White Plains, NY 10601
                                                                914-574-4510
                                                                Email:
                                                                DCollins@silvermanandassociatesny.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Caroline Beth Lineen**
                                                                Silverman and Associates
                                                                445 Hamilton Ave. # 1102
                                                                White Plains, NY 10601
                                                                (914) 574-4510
                                                                Fax: (914) 574-4515

**[SA-2]**

Email:
clineen@silvermanandassociatesny.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/15/2022 | 1 | COMPLAINT against Newburgh Enlarged City School District. (Filing Fee $ 402.00, Receipt Number ANYSDC-26286636)Document filed by Christa O'Neill. (Attachments: # 1 Exhibit Notice of Right to Sue Letter).(Karlin, Stewart) (Entered: 06/15/2022) |
| 06/15/2022 | 2 | CIVIL COVER SHEET filed..(Karlin, Stewart) (Entered: 06/15/2022) |
| 06/15/2022 | 3 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR -** REQUEST FOR ISSUANCE OF SUMMONS as to Newburgh Enlarged City School District, re: 1 Complaint. Document filed by Christa O'Neill..(Karlin, Stewart) Modified on 6/16/2022 (pc). (Entered: 06/15/2022) |
| 06/16/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Denise L. Cote. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 06/16/2022) |
| 06/16/2022 | | Magistrate Judge Katharine H. Parker is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 06/16/2022) |
| 06/16/2022 | | Case Designated ECF. (pc) (Entered: 06/16/2022) |
| 06/16/2022 | | ***NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Stewart Lee Karlin. The following case opening statistical information was erroneously selected/entered: Dollar Demand $300,000,000; County code Albany;. The following correction(s) have been made to your case entry: the Dollar Demand has been modified to $300,000; the County code has been modified to Ulster;. (pc) (Entered: 06/16/2022) |
| 06/16/2022 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Stewart Lee Karlin to RE-FILE Document No. 3 Request for Issuance of Summons. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the issuance of summons is not correct; Use the standard AO 440 summons form, not the FIOA summons;. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (pc) (Entered: 06/16/2022) |
| 06/16/2022 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to Newburgh Enlarged City School District, re: 1 Complaint. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 06/16/2022) |
| 06/17/2022 | 5 | ELECTRONIC SUMMONS ISSUED as to Newburgh Enlarged City School District..(lal) (Entered: 06/17/2022) |

**[SA-3]**

| 06/21/2022 | 6 | LETTER addressed to Judge Denise L. Cote from Stewart Karlin dated June 21, 2022 re: Assignment to White Plains. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 06/21/2022) |
|---|---|---|
| 06/23/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Philip M. Halpern. Judge Denise L. Cote is no longer assigned to the case. (vba) (Entered: 06/23/2022) |
| 06/23/2022 | | Magistrate Judge Judith C. McCarthy is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (vba) (Entered: 06/23/2022) |
| 08/04/2022 | 7 | AFFIDAVIT OF SERVICE. Newburgh Enlarged City School District served on 8/1/2022, answer due 8/22/2022. Service was accepted by Matthew McCoy, District Clerk. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 08/04/2022) |
| 08/22/2022 | 8 | NOTICE OF APPEARANCE by Deanna L. Collins on behalf of Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 08/22/2022) |
| 08/22/2022 | 9 | ANSWER to 1 Complaint with JURY DEMAND. Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 08/22/2022) |
| 08/22/2022 | 10 | ORDER OF AUTOMATIC REFERRAL TO MEDIATION (See M-10-468 Second Amended Standing Order). Please reference the Pilot Discovery Protocols, attached, and the Mediation Program Procedures (https://nysd.uscourts.gov/programs/mediation-adr). E-mail MediationOffice@nysd.uscourts.gov, telephone 212-805-0643. Mediator to be Assigned by 9/6/2022. (Signed by Judge Loretta A. Preska on 10/1/2015) (jpt) (Entered: 08/23/2022) |
| 08/23/2022 | 11 | NOTICE OF INITIAL CONFERENCE: THIS MATTER HAS BEEN SCHEDULED FOR AN INITIAL CASE MANAGEMENT AND SCHEDULING CONFERENCE, pursuant to Fed. R. Civ. P. 16, on October 26, 2022 at 11:00 a.m., by telephone conference. At the time of the scheduled conference, all parties shall call the following number: (888) 398-2342; access code 3456831. Initial Conference set for 10/26/2022 at 11:00 AM before Judge Philip M. Halpern..(rro) (Entered: 08/23/2022) |
| 09/07/2022 | | NOTICE OF MEDIATOR ASSIGNMENT - Notice of assignment of mediator. Mediator Schedule due by 10/7/2022.(ah) (Entered: 09/07/2022) |
| 10/07/2022 | | FIRST MEDIATION CONFERENCE. Mediation Conference scheduled for 12/1/2022 at 10:00 AM in telephone or video conference.(mnp) (Entered: 10/07/2022) |
| 10/19/2022 | 12 | PROPOSED CASE MANAGEMENT PLAN. Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 10/19/2022) |
| 10/26/2022 | | Minute Entry for proceedings held before Judge Philip M. Halpern: Initial Pretrial Telephone Conference held on 10/26/2022. Counsel for all parties appeared. A Civil Case Discovery Plan and Scheduling Order will be docketed separately. (fc) (Entered: 10/26/2022) |
| 10/26/2022 | 13 | CIVIL CASE DISCOVERY PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). This case is to be tried to a jury. Any motion to amend or to join additional parties shall be filed by 11/21/2022. Non-expert depositions shall be completed by 1/20/2023. SO ORDERED. Motions due by 11/21/2022. Expert Deposition due by 4/4/2023. Fact Discovery due by 2/20/2023. Expert Discovery due by 4/4/2023. Discovery due by 4/4/2023. Estimate length of trial 3-4 days. Case Management |

| | | |
|---|---|---|
| | | Conference set for 5/24/2023 [SA-44]M before Judge Philip M. Halpern. (Signed by Judge Philip M. Halpern on 10/26/2022) (tg) (Entered: 10/26/2022) |
| 12/01/2022 | | Minute Entry for proceedings held before SDNY Mediation: Mediation Conference held on 12/1/2022. Mediation Status due by 1/3/2023. (mnp) (Entered: 12/05/2022) |
| 12/05/2022 | | SUBSEQUENT MEDIATION CONFERENCE. Mediation Conference scheduled for 1/19/2023 at 10:00 AM in telephone or video conference.(mnp) (Entered: 12/05/2022) |
| 12/14/2022 | 14 | LETTER addressed to Judge Philip M. Halpern from Deanna L. Collins dated 12/14/2022 re: request to cancel referral to mediation. Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 12/14/2022) |
| 12/15/2022 | 15 | MEMO ENDORSEMENT on re: 14 Letter filed by Newburgh Enlarged City School District. ENDORSEMENT Application granted. The Court's mediation referral Order at Doc. 10 is terminated. The parties shall notify their mediator promptly that the referral is canceled. SO ORDERED. (Signed by Judge Philip M. Halpern on 12/15/2022) (jca) (Entered: 12/15/2022) |
| 12/15/2022 | | Transmission to Mediation Clerk. Transmitted re: 15 Memo Endorsement,, to the Mediation Clerk for case processing. (jca) (Entered: 12/15/2022) |
| 01/18/2023 | 17 | CONSENT LETTER MOTION for Extension of Time to Complete Discovery addressed to Judge Philip M. Halpern from Stewart L Karlin dated January 18, 2023. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 01/18/2023) |
| 01/19/2023 | 18 | ORDER granting 17 Letter Motion for Extension of Time to Complete Discovery. Application granted. The deadline for the completion of fact discovery and all discovery is extended to April 28, 2023. The Case Management Conference scheduled for May 24, 2023 is rescheduled to 12:00 p.m. on June 1, 2023. The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 17. SO ORDERED. Deposition due by 3/31/2023. Discovery due by 4/28/2023. (Signed by Judge Philip M. Halpern on 1/19/2023) (tg) (Entered: 01/19/2023) |
| 01/19/2023 | | Set/Reset Deadlines: ( Fact Discovery due by 4/28/2023.), Set/Reset Hearings:( Case Management Conference set for 6/1/2023 at 12:00 PM before Judge Philip M. Halpern.) (tg) (Entered: 01/19/2023) |
| 03/06/2023 | 19 | CONSENT LETTER MOTION for Extension of Time to Complete Discovery addressed to Judge Philip M. Halpern from Stewart L Karlin dated March 6, 2023. Document filed by Christa O'Neill. (Attachments: # 1 Exhibit Orange County Supreme Court Decision). (Karlin, Stewart) (Entered: 03/06/2023) |
| 03/07/2023 | 20 | ORDER granting 19 Letter Motion for Extension of Time to Complete Discovery. Application granted. The deadline for the completion of fact discovery and all discovery is extended to May 31, 2023. The Case Management Conference scheduled for May 24, 2023 is rescheduled to 12:00 p.m. on July 6, 2023. The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 19. SO ORDERED.. (Signed by Judge Philip M. Halpern on 3/7/2023) (ks) (Entered: 03/07/2023) |
| 03/07/2023 | | Set/Reset Deadlines: ( Discovery due by 5/31/2023., Fact Discovery due by 5/31/2023.), Set/Reset Hearings:( Case Management Conference set for 7/6/2023 at 12:00 PM before Judge Philip M. Halpern.) (ks) (Entered: 03/07/2023) |
| 03/29/2023 | 21 | PROPOSED STIPULATION AND ORDER. Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 03/29/2023) |
| 03/30/2023 | 22 | STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of |

| | | |
|---|---|---|
| | | confidential material...SO ORDERED. [SEE-5] Signed by Judge Philip M. Halpern on 3/30/2023) (vfr) (Entered: 03/30/2023) |
| 04/28/2023 | 23 | CONSENT LETTER MOTION for Extension of Time to Complete Discovery addressed to Judge Philip M. Halpern from Stewart L Karlin dated April 28,2023. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 04/28/2023) |
| 05/01/2023 | 24 | ORDER granting 23 Letter Motion for Extension of Time to Complete Discovery.Application granted. The deadline for the completion of fact discovery and all discovery is extended to June 15, A2023. No further extensions of the discovery schedule will 2be granted. The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 23. SO ORDERED. Discovery due by 6/15/2023. (Signed by Judge Philip M. Halpern on 5/1/2023) (jca) (Entered: 05/01/2023) |
| 05/01/2023 | | Set/Reset Deadlines: Fact Discovery due by 6/15/2023. (jca) (Entered: 05/01/2023) |
| 06/13/2023 | 25 | JOINT LETTER MOTION for Extension of Time to Complete Discovery addressed to Judge Philip M. Halpern from Deanna L. Collins dated 06/13/2023. Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 06/13/2023) |
| 06/14/2023 | 26 | ORDER denying 25 Letter Motion for Extension of Time to Complete Discovery. Application denied. SO ORDERED. (Signed by Judge Philip M. Halpern on 6/14/2023) (jca) (Entered: 06/14/2023) |
| 06/21/2023 | 27 | CONSENT LETTER MOTION for Extension of Time *to serve 56.1 statements and file pre-motion letter* addressed to Judge Philip M. Halpern from Deanna L. Collins dated 06/21/2023. Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 06/21/2023) |
| 06/21/2023 | 28 | ORDER granting 27 Letter Motion for Extension of Time. Application granted on consent of the parties. The parties' deadline to file any summary judgment pre-motion letters is extended to August 4, 2023. The case management conference scheduled for July 6, 2023 is rescheduled to August 29, 2023 at 11:00 a.m. At the time of the scheduled conference all parties shall call (888) 398-2342; access code: 3456831. The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 27. SO ORDERED.. (Signed by Judge Philip M. Halpern on 6/21/2023) (jca) (Entered: 06/21/2023) |
| 06/21/2023 | | Set/Reset Hearings: Telephone Conference set for 8/29/2023 at 11:00 AM before Judge Philip M. Halpern. (jca) (Entered: 06/21/2023) |
| 07/12/2023 | 29 | CONSENT LETTER MOTION for Extension of Time *to serve 56.1 statements and file pre-motion letter (second request)* addressed to Judge Philip M. Halpern from Deanna L. Collins dated 07/12/2023. Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 07/12/2023) |
| 07/12/2023 | 30 | ORDER granting 29 Letter Motion for Extension of Time. Application granted on consent of the parties. The parties' deadline to file any summary judgment pre-motion letters is extended to August 18, 2023. No further extensions of time to file summary judgment pre-motion letters will be granted. The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 29. SO ORDERED.. (Signed by Judge Philip M. Halpern on 7/12/2023) (jca) (Entered: 07/12/2023) |
| 08/08/2023 | 31 | **FILING ERROR - DEFICIENT DOCKET ENTRY -**CONSENT LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Philip M. Halpern from Stewart L Karlin dated August 8, 2023. Document filed by Christa O'Neill..(Karlin, Stewart) Modified on 8/8/2023 (db). (Entered: 08/08/2023) |
| 08/08/2023 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Stewart Lee Karlin to RE-FILE Document 31** |

**[SA-6]**

| | | |
|---|---|---|
| | | **CONSENT LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Philip M. Halpern from Stewart L Karlin dated August 8, 2023. ERROR(S): No signature or s/. (db)** (Entered: 08/08/2023) |
| 08/08/2023 | 32 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Philip M. Halpern from Stewart L Karlin dated August 8, 2023. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 08/08/2023) |
| 08/08/2023 | 33 | ORDER denying 32 Letter Motion for Extension of Time to File Response/Reply re 32 CONSENT LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Philip M. Halpern from Stewart L Karlin dated August 8, 2023. Application denied. The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 32. SO ORDERED.. (Signed by Judge Philip M. Halpern on 8/8/2023) (jca) (Entered: 08/08/2023) |
| 08/18/2023 | 34 | LETTER MOTION for Conference *to discuss defendant's anticipated motion for summary judgment* addressed to Judge Philip M. Halpern from Deanna L. Collins dated 08/18/2023. Document filed by Newburgh Enlarged City School District. (Attachments: # 1 Exhibit Ex A (Def.'s 56.1 Statement), # 2 Exhibit Ex B (Pl.'s 56.1 Statement Resp.)).(Collins, Deanna) (Entered: 08/18/2023) |
| 08/22/2023 | 35 | ORDER denying without prejudice to renewal 34 Letter Motion for Conference re: 34 LETTER MOTION for Conference *to discuss defendant's anticipated motion for summary judgment* addressed to Judge Philip M. Halpern from Deanna L. Collins dated 08/18/2023. Application denied without prejudice to renewal. The Court will not accept the Rule 56.1 Statements that are annexed to Defendants' pre-motion letter (Doc. 34-1, Doc. 34-2) for failure to comply with the Court's applicable rules. By August 28, 2023, the parties shall meet and confer and revise the Rule 56.1 Statement and responses so as to comply with the Court's rules, including limiting the Rule 56.1 Statement to 25 pages; setting forth any counterstatement of facts at the end of the document only, to the extent required to address facts applicable to claims for relief or defenses, together with responses from the moving party; and to otherwise comply with the rules applicable to summary judgment motion practice. See, e.g., Emanuel v. Gap, Inc., et al., 2022 WL 3084317 (S.D.N.Y. Aug. 3, 2022). Defendants shall file the single document representing the Rule 56.1 Statement with responses by August 28, 2023 at 5:00 p.m. To the extent Defendants intend to file a renewed request for a pre-motion conference, Defendant's pre-motion letter shall be filed with the revised Rule 56.1 Statement by August 28, 2023 at 5:00 p.m. The case management conference scheduled for August 29, 2023 at 11:00 a.m. is adjourned sine die. The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 34. SO ORDERED (Signed by Judge Philip M. Halpern on 8/22/2023) (jca) (Entered: 08/22/2023) |
| 08/22/2023 | 36 | LETTER MOTION for Extension of Time to File *Revised 56.1 Statement of Facts and Pre-motion Letter* addressed to Judge Philip M. Halpern from Caroline B. Lineen dated August 22, 2023. Document filed by Newburgh Enlarged City School District..(Lineen, Caroline) (Entered: 08/22/2023) |
| 08/23/2023 | 37 | ORDER granting 36 Letter Motion for Extension of Time to File. Application granted. The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 36. SO ORDERED. (Signed by Judge Philip M. Halpern on 8/23/2023) (jca) (Entered: 08/23/2023) |
| 08/29/2023 | 38 | PROPOSED CONSENT TO JURISDICTION BY US MAGISTRATE JUDGE by Christa O'Neill. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 08/29/2023) |
| 08/29/2023 | 39 | CONSENT TO JURISDICTION BY A US MAGISTRATE JUDGE by Newburgh Enlarged City School District, Christa O'Neill. (Case No Longer Referred to Magistrate |

| | | |
|---|---|---|
| | | Judge) CASE ASSIGNED to Magistrate Judge Judith C. McCarthy. (Signed by Judge Philip M. Halpern on 8/29/2023).(tg) (Entered: 08/29/2023) |
| 08/30/2023 | 40 | SCHEDULING ORDER: The Court has scheduled a Status Conference for September 6, 2023 at 11:00 a.m. before Magistrate Judge Judith C. McCarthy in Courtroom 421. SO ORDERED. Status Conference set for 9/6/2023 at 11:00 AM in Courtroom 421, 300 Quarropas Street, White Plains, NY 10601 before Magistrate Judge Judith C. McCarthy. (Signed by Magistrate Judge Judith C. McCarthy on 8/30/2023) (vfr) (Entered: 08/30/2023) |
| 08/31/2023 | 41 | NOTICE OF APPEARANCE by Natalia Mercedes Kapitonova on behalf of Christa O'Neill..(Kapitonova, Natalia) (Entered: 08/31/2023) |
| 09/06/2023 | | Minute Entry for proceedings held before Magistrate Judge Judith C. McCarthy: Status Conference held on September 6, 2023. Defendant's motion for summary judgment is due by October 6, 2023; Plaintiff's response is due by November 6, 2023; and Defendant's reply, if any, is due by November 17, 2023. (Court Reporter Courtflow) (jah) (Entered: 09/06/2023) |
| 10/06/2023 | 42 | MOTION for Summary Judgment (notice of motion). Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 10/06/2023) |
| 10/06/2023 | 43 | MEMORANDUM OF LAW in Support re: 42 MOTION for Summary Judgment (notice of motion). . Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 10/06/2023) |
| 10/06/2023 | 44 | DECLARATION of Deanna L. Collins in Support re: 42 MOTION for Summary Judgment (notice of motion).. Document filed by Newburgh Enlarged City School District. (Attachments: # 1 Exhibit Ex A (Relevant Policies), # 2 Exhibit Ex B (April 30 2003 Letter), # 3 Exhibit Ex C (May 12 2022 Letter), # 4 Exhibit Ex D (Stipulation of Settlement), # 5 Exhibit Ex E (3020a Transcript) (part 1 of 2), # 6 Exhibit Ex E (3020a Transcript) (part 2 of 2), # 7 Exhibit Ex F (SLP Job Description), # 8 Exhibit Ex G (50h Transcript Day 1), # 9 Exhibit Ex H (Plaintiff's Deposition Transcript), # 10 Exhibit Ex I (Brancato Deposition Transcript & Errata), # 11 Exhibit Ex J (Pryne Deposition Transcript), # 12 Exhibit Ex K (Collective Bargaining Agreement), # 13 Exhibit Ex L (Brooks Deposition Transcript), # 14 Exhibit Ex M (50h Transcript Day 2), # 15 Exhibit Ex N (Lugo Schedule), # 16 Exhibit Ex O (Sanchez Schedule), # 17 Exhibit Ex P (Carton Schedule), # 18 Exhibit Ex Q (Ginda Schedule), # 19 Exhibit Ex R (March 3 2021 Email Chain), # 20 Exhibit Ex S (March 4 2021 Email invite), # 21 Exhibit Ex T (Orwick Deposition Transcript), # 22 Exhibit Ex U (February 22 2021 Email between Plaintiff and Brancato), # 23 Exhibit Ex V (Plaintiff's computer screenshot), # 24 Exhibit Ex W (SLT contacts), # 25 Exhibit Ex X (Catalusci Deposition Transcript), # 26 Exhibit Ex Y (2008-09 correspondence), # 27 Exhibit Ex Z (April 3 2019 Letter), # 28 Exhibit Ex AA (2019 3020a Charges), # 29 Exhibit Ex BB (January 10 2020 Letter), # 30 Exhibit Ex CC (March 12 2020 Letter), # 31 Exhibit Ex DD (RS Attendance Summary report marked Ex 9), # 32 Exhibit Ex EE (RS Attendance Summary Report marked Ex 11), # 33 Exhibit Ex FF (RS Attendance Summary Comparison Report), # 34 Exhibit Ex GG (February 22 2021 Email), # 35 Exhibit Ex HH (February 23 2021 Email Chain), # 36 Exhibit Ex II (March 11 2021 Letter), # 37 Exhibit Ex JJ (April 5 2021 Letter), # 38 Exhibit Ex KK (June 8 2021 Letter), # 39 Exhibit Ex LL (RS Attendance Summary Report marked Ex 18), # 40 Exhibit Ex MM (IEP Direct Access Report), # 41 Exhibit Ex NN (IEP Direct Access Report Summary marked Ex 19), # 42 Exhibit Ex OO (IEP Direct Access Report Summary marked Ex 17b), # 43 Exhibit Ex PP (June 10 2021 Meeting Minutes), # 44 Exhibit Ex QQ (2021 3020a Charges), # 45 Exhibit Ex RR (June 23 2021 Letter), # 46 Exhibit Ex SS (3020a Decision), # 47 Exhibit Ex TT (May 10 2022 Agenda Item Details), # 48 Exhibit Ex UU (SMS Ethnicities 2020-2021), # 49 Exhibit Ex VV (Related Service Personnel), # 50 Exhibit Ex |

**[SA-8]**

| | | |
|---|---|---|
| | | WW (Plaintiff's Google Spreadsheet), # 51 Exhibit Ex XX (March 5 2021 Email), # 52 Exhibit Ex YY (March 18 2021 Email), # 53 Exhibit Ex ZZ (March 26 2021 Chat Thread), # 54 Exhibit Ex AAA (Revision History Google Spreadsheet), # 55 Exhibit Ex BBB (Grievance documents), # 56 Exhibit Ex CCC (July 6 2017 Board Minutes), # 57 Exhibit Ex DDD (August 30 2020 Email Chain), # 58 Exhibit Ex EEE (October 3 2020 Letter), # 59 Exhibit Ex FFF (Sub Coverage Summary and Sheets) (part 1 of 4), # 60 Exhibit Ex FFF (Sub Coverage Summary and Sheets) (part 2 of 4), # 61 Exhibit Ex FFF (Sub Coverage Summary and Sheets) (part 3 of 4), # 62 Exhibit Ex FFF (Sub Coverage Summary and Sheets) (part 4 of 4), # 63 Exhibit Ex GGG (Trapani Email Chain), # 64 Exhibit Ex HHH (Google Classroom Emails and Chat), # 65 Exhibit Ex III (EEOC Charge), # 66 Exhibit Ex JJJ (Notice of Right to Sue), # 67 Exhibit Ex KKK (Verified Petition)).(Collins, Deanna) (Entered: 10/06/2023) |
| 10/06/2023 | 45 | DECLARATION of Deanna L. Collins (Supplemental Declaration) in Support re: 42 MOTION for Summary Judgment *(notice of motion)*.. Document filed by Newburgh Enlarged City School District. (Attachments: # 1 Exhibit Ex LLL (Frontline emails), # 2 Exhibit Ex MMM (Notice of Claim)).(Collins, Deanna) (Entered: 10/06/2023) |
| 10/06/2023 | 46 | RULE 56.1 STATEMENT. Document filed by Newburgh Enlarged City School District. (Attachments: # 1 Supplement Plaintiff's 56.1 Responses).(Collins, Deanna) (Entered: 10/06/2023) |
| 10/26/2023 | 47 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 42 MOTION for Summary Judgment *(notice of motion)*. addressed to Magistrate Judge Judith C. McCarthy from Stewart Karlin dated October 26, 2023. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 10/26/2023) |
| 10/26/2023 | 48 | ORDER granting 47 Letter Motion for Extension of Time. Plaintiff's time to file her opposition to Defendant's motion for summary judgment is extended to November 17, 2023. Defendant's reply, if any, is now due on December 6, 2023. (HEREBY ORDERED by Magistrate Judge Judith C. McCarthy)(Text Only Order) (McCarthy, Judith) (Entered: 10/26/2023) |
| 11/09/2023 | 49 | CONSENT LETTER MOTION for Leave to File Excess Pages addressed to Magistrate Judge Judith C. McCarthy from Stewart Karlin dated November 9, 2023. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 11/09/2023) |
| 11/09/2023 | 50 | ORDER granting 49 Letter Motion for Leave to File Excess Pages. Plaintiff is permitted to file a memorandum of law that does not exceed 30 pages. (HEREBY ORDERED by Magistrate Judge Judith C. McCarthy)(Text Only Order) (McCarthy, Judith) (Entered: 11/09/2023) |
| 11/17/2023 | 51 | MEMORANDUM OF LAW in Opposition re: 47 CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 42 MOTION for Summary Judgment *(notice of motion)*. addressed to Magistrate Judge Judith C. McCarthy from Stewart Karlin dated October 26, 2023., 49 CONSENT LETTER MOTION for Leave to File Excess Pages addressed to Magistrate Judge Judith C. McCarthy from Stewart Karlin dated November 9, 2023., 42 MOTION for Summary Judgment *(notice of motion)*. . Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 11/17/2023) |
| 11/17/2023 | 52 | DECLARATION of Christa O'Neill in Opposition re: 47 CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 42 MOTION for Summary Judgment *(notice of motion)*. addressed to Magistrate Judge Judith C. McCarthy from Stewart Karlin dated October 26, 2023., 42 MOTION for Summary Judgment *(notice of motion)*.. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 11/17/2023) |
| 11/17/2023 | 53 | DECLARATION of Natalia Kapitonova in Opposition re: 47 CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 42 MOTION for Summary |

**[SA-9]**

| | | |
|---|---|---|
| | | Judgment *(notice of motion)*. addressed to Magistrate Judge Judith C. McCarthy from Stewart Karlin dated October 26, 2023., 42 MOTION for Summary Judgment *(notice of motion)*.. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 11/17/2023) |
| 11/17/2023 | 54 | AFFIRMATION of Stewart Karlin in Opposition re: 42 MOTION for Summary Judgment *(notice of motion)*., 47 CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 42 MOTION for Summary Judgment *(notice of motion)*. addressed to Magistrate Judge Judith C. McCarthy from Stewart Karlin dated October 26, 2023.. Document filed by Christa O'Neill. (Attachments: # 1 Exhibit Decision and Order of the Orange County Supreme Court, # 2 Exhibit Verified Petition, # 3 Exhibit Emails between Vincent Brancato and Sherida Moore, # 4 Exhibit Summary Session Notes, # 5 Exhibit Union letter, dated September 11, 2020, # 6 Exhibit Plaintiff's Notice of Claim with Affidavit of Service).(Karlin, Stewart) (Entered: 11/17/2023) |
| 11/30/2023 | 55 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 51 Memorandum of Law in Opposition to Motion,, *(extension of time for Defendant to file its summary judgment reply brief)* addressed to Magistrate Judge Judith C. McCarthy from Deanna L. Collins dated 11/30/2023. Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 11/30/2023) |
| 12/01/2023 | 56 | ORDER granting 55 Letter Motion for Extension of Time to File Reply. The time for Defendant to file its reply is extended to December 15, 2023. (HEREBY ORDERED by Magistrate Judge Judith C. McCarthy)(Text Only Order) (McCarthy, Judith) (Entered: 12/01/2023) |
| 12/12/2023 | 57 | CONSENT LETTER MOTION for Leave to File Excess Pages *with respect to Defendant's summary judgment reply brief* addressed to Magistrate Judge Judith C. McCarthy from Deanna L. Collins dated 12/12/2023. Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 12/12/2023) |
| 12/12/2023 | 58 | ORDER granting 57 Letter Motion for Leave to File Excess Pages. Defendant's reply brief may exceed the page limit by no more than 3 pages. (HEREBY ORDERED by Magistrate Judge Judith C. McCarthy)(Text Only Order) (McCarthy, Judith) (Entered: 12/12/2023) |
| 12/14/2023 | 59 | REPLY MEMORANDUM OF LAW in Support re: 42 MOTION for Summary Judgment *(notice of motion)*. . Document filed by Newburgh Enlarged City School District..(Collins, Deanna) (Entered: 12/14/2023) |
| 12/14/2023 | 60 | REPLY AFFIRMATION of Deanna L. Collins in Support re: 42 MOTION for Summary Judgment *(notice of motion)*.. Document filed by Newburgh Enlarged City School District. (Attachments: # 1 Exhibit Ex NNN (IEPs) (part 1 of 8), # 2 Exhibit Ex NNN (IEPs) (part 2 of 8), # 3 Exhibit Ex NNN (IEPs) (part 3 of 8), # 4 Exhibit Ex NNN (IEPs) (part 4 of 8), # 5 Exhibit Ex NNN (IEPs) (part 5 of 8), # 6 Exhibit Ex NNN (IEPs) (part 6 of 8), # 7 Exhibit Ex NNN (IEPs) (part 7 of 8), # 8 Exhibit Ex NNN (IEPs) (part 8 of 8), # 9 Exhibit Ex OOO (District Calendar), # 10 Exhibit Ex PPP (Google Map), # 11 Exhibit Ex QQQ (Catalusci Log), # 12 Exhibit Ex RRR (Summary of Related Services Session Notes), # 13 Exhibit Ex SSS (Telehealth consent forms log excerpt)).(Collins, Deanna) (Entered: 12/14/2023) |
| 12/18/2023 | 61 | CONSENT LETTER MOTION for Oral Argument *in connection with Defendant's Summary Judgment Motion* addressed to Magistrate Judge Judith C. McCarthy from Stewart Karlin dated December 18, 2023. Document filed by Christa O'Neill..(Karlin, Stewart) (Entered: 12/18/2023) |
| 12/19/2023 | 62 | ORDER denying without prejudice 61 Letter Motion for Oral Argument. The Court will notify the parties if it determines that oral argument would be helpful. (HEREBY |

**[SA-10C]**

| | | |
|---|---|---|
| | | ORDERED by Magistrate Judge Judith C. McCarthy)(Text Only Order) (McCarthy, Judith) (Entered: 12/19/2023) |
| 06/26/2024 | 63 | OPINION AND ORDER re: 42 MOTION for Summary Judgment *(notice of motion)* filed by Newburgh Enlarged City School District. For the foregoing reasons, Defendant's motion for summary judgment is granted as to Plaintiff's Title VII claim, and that claim is dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim and dismisses that claim without prejudice to renew in state court. The Clerk is respectfully directed to terminate the pending motion (Docket No. 42), enter judgment for Defendant, and close the case. SO ORDERED. (Signed by Magistrate Judge Judith C. McCarthy on 6/26/2024) (vfr) Transmission to Orders and Judgments Clerk for processing. (Entered: 06/26/2024) |
| 06/26/2024 | 64 | CLERK'S JUDGMENT re: 63 Memorandum & Opinion in favor of Newburgh Enlarged City School District against Christa O'Neill. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated June 26, 2024, Defendant's motion for summary judgment is granted as to Plaintiff's Title VII claim, and that claim is dismissed with prejudice. The Court has declined to exercise supplemental jurisdiction over Plaintiff's remaining state law claim and dismisses that claim without prejudice to renew in state court; accordingly, the case is closed. (Signed by Clerk of Court - Acting Daniel Ortiz on 6/26/2024) (Attachments: # 1 Appeal Package) (km) (Entered: 06/26/2024) |
| 07/25/2024 | 65 | NOTICE OF APPEAL from 63 Memorandum & Opinion,,, 64 Clerk's Judgment,,. Document filed by Christa O'Neill. Filing fee $ 605.00, receipt number ANYSDC-29653511. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Karlin, Stewart) Modified on 7/25/2024 (nd). (Entered: 07/25/2024) |
| 07/25/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 65 Notice of Appeal,..(nd) (Entered: 07/25/2024) |
| 07/25/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 65 Notice of Appeal, filed by Christa O'Neill were transmitted to the U.S. Court of Appeals..(nd) (Entered: 07/25/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/31/2024 14:20:09 | | |
| **PACER Login:** | cnkslklaw | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 7:22-cv-05017-JCM |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

# [SA-11]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**Opinion and Order
Appealing From
[SA11-SA48]**

-----------------------------------------------------------X

CHRISTA O'NEILL,

                       Plaintiff,

         -against-

NEWBURGH ENLARGED CITY
SCHOOL DISTRICT,

                       Defendant.

**OPINION AND ORDER**

22 Civ. 5017 (JCM)

-----------------------------------------------------------X

        Plaintiff Christa O'Neill ("Plaintiff") brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL") against Defendant Newburgh Enlarged City School District ("Defendant" or the "District") alleging employment discrimination and a hostile work environment. (Docket No. 1).[1]

        Currently before the Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Motion"). (Docket Nos. 42, 43). Plaintiff opposed the Motion, (Docket No. 51), and Defendant replied, (Docket No. 60). For the reasons set forth below, Defendant's motion for summary judgment is granted as to Plaintiff's Title VII employment discrimination claim.[2] The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL claim, and that claim is, accordingly, dismissed without prejudice to renew in state court.[3]

---

[1] Plaintiff received a Notice of Right to Sue letter from the Equal Employment Opportunity Commission, dated May 23, 2022. (*See* Def. Ex. JJJ).

[2] Plaintiff initially pleaded claims for both employment discrimination and a hostile work environment under Title VII. (Docket No. 1 ¶¶ 75-77). However, in opposition to the Motion, Plaintiff withdrew "her hostile work environment claim under Title VII and is proceeding under state law only." (Docket No. 51 at 31). Thus, the only remaining federal claim is for employment discrimination under Title VII.

[3] The parties have consented to the undersigned for all purposes, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Docket No. 39).

## [SA-12]

### I.    BACKGROUND

The following facts are taken from Defendant's Statement of Material Facts submitted

pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and

Eastern Districts of New York ("Def. 56.1"), (Docket No. 46), Plaintiff's Response to

Defendant's Local Civil Rule 56.1 Statement ("Pl. 56.1 Resp."), (Docket No. 46-1), and the

affidavits and exhibits submitted by the parties in support thereof.[4]  The following facts are

construed in the light most favorable to Plaintiff as the party opposing summary judgment. *See*

*Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  Any disputes of material fact

are noted.[5]

### A.    Plaintiff's Employment in the Newburgh Enlarged City School District

Plaintiff, an African American woman, worked in the Newburgh Enlarged City School

District as a tenured Speech/Language Pathologist ("SLP") from March 19, 2003 to May 10,

2022. (Def. 56.1 ¶ 3).  She was one of approximately sixteen SLPs in the District. (*Id.* ¶ 23).  In

2020-2021, Plaintiff was assigned to two schools: South Middle School ("SMS") and San

Miguel Academy ("San Miguel"). (*Id.* ¶ 24).  She worked primarily in SMS but traveled to San

Miguel two to three days a week. (*Id.*).  Plaintiff was the only SLP at either school, (*id.* ¶¶ 25-

26), and reported primarily to three individuals: (i) the Principal of SMS, Chante Brooks; (ii) the

Assistant Principal of SMS, Vincent Brancato; and (iii) the Director of Special Education, Janet

---

[4] Specifically, Defendant submitted two declarations from its attorney, Deanna L. Collins, attaching sixty-nine exhibits, (Docket Nos. 44, 45, 60) ("Def. Exs. A-SSS"), as well as a reply affirmation from Ms. Collins, attaching an additional thirteen exhibits, (Docket No. 60).  In response, Plaintiff submitted: (i) a declaration on her own behalf, (Docket No. 52) ("Pl. Decl."); (ii) a declaration from one of her attorneys, Natalia Kapitonova, (Docket No. 53); and (iii) an affirmation from another one of her attorneys, Stewart L. Karlin, attaching six exhibits, (Docket No. 54).

[5] Defendant argues that nearly all its statements of fact submitted under Rule 56.1 should be deemed admitted because Plaintiff's responses are conclusory and fail to cite to admissible evidence. (Docket No. 43 at 31).  Rather than issue a blanket ruling, the Court will address the sufficiency of Plaintiff's responses on a statement-by-statement basis as necessary for resolution of the Motion.

# [SA-13]

Orwick,[6] (*id.* ¶¶ 27-28).  Ms. Brooks was African American, while Mr. Brancato and Ms.

Orwick were Caucasian. (Docket No. 51 at 1-3).

In her role as a SLP, Plaintiff was "required to provide therapy services, to write and

update Individualized Education Plan ("IEP") goals for students with mandated speech therapy

on her caseload, as well as to keep ongoing needed records." (Pl. 56.1 Resp. ¶ 5).  These records

included student attendance and "speech language service information," which she was supposed

to enter in a program called "IEP Direct." (*Id.* ¶ 6).  The parties dispute the frequency with which

Plaintiff was required to enter this information.  Defendant alleges that she was required to enter

it "within thirty days" of each session, while Plaintiff claims it "should be inputted as soon as

reasonably practical." (*Compare id.* ¶ 9 *with* Pl. 56.1 Resp. ¶ 6).  However, neither party disputes

that Plaintiff was required to input this information as part of her job responsibilities. (*Id.*).  This

data was used by the District to track student progress and bill Medicaid for services rendered.

(Def. 56.1 ¶ 8.).  The crux of the parties' current dispute is whether Plaintiff's inconsistent

recordkeeping was a proper basis for her termination, or if it was merely a pretext to fire her

because of her race.[7]

## B.    Allegations of Prior Misconduct

Plaintiff's inconsistent recordkeeping first became a problem during the 2008-2009

school year when she failed to submit documentation required to bill Medicaid. (*Id.* ¶ 32).

Plaintiff claims she does not recall this incident, but Defendant submitted contemporaneous

---

[6] Plaintiff disputes the degree to which Ms. Orwick was responsible for supervising her work, alleging that she had only indirect supervisory responsibility over her. (Pl. 56.1 Resp. ¶ 29).

[7] Defendant maintains that Plaintiff's recordkeeping was not merely inconsistent, but that for extended stretches of time it was non-existent. (*See* Docket No. 43 at 3-10).  Plaintiff does not dispute that at times she did not enter information in a timely manner but claims that this was due to her increased responsibilities during the COVID-19 pandemic and that she entered the information as soon as "reasonably practical." (*See* Pl. 56.1 Resp. ¶ 9; Docket No. 51 at 6-10).

# [SA-14]

records in support of the allegation. (*See* Pl. 56.1 Resp. ¶ 32; Def. Ex. Y). The problem occurred

again during the 2016-2017, 2017-2018, and 2018-2019 school years. (Def. 56.1 ¶ 33). During

the 2018-2019 school year, Ms. Orwick discovered that Plaintiff's records were not up to date

and, upon further investigation, she learned that the problem extended through the prior two

school years as well. (*Id.*). As a result, the District filed Section 3020-a charges[8] against Plaintiff

and placed her on administrative leave while the charges were adjudicated. (*Id.* ¶¶ 35-36). The

charges filed included, among other things, "(1) failing to document approximately 844

mandated speech and language therapy sessions for approximately 64 students . . . during the

2016-2017 school year; and (2) failing to document approximately 1,385 mandated speech and

language therapy sessions for approximately 54 students with IEPs during the 2017-2018 school

year." (*Id.* ¶ 37; Def. Ex. AA).

## C.    The Stipulation of Settlement

On July 15, 2019, the parties agreed to settle these charges, which was memorialized in a

Stipulation of Settlement (the "Stipulation"). (Def. 56.1 ¶ 39; Def. Ex. D). Pursuant to the

Stipulation, Plaintiff "admit[ed] that during the 2016-17 and 2017-18 school years she did not

accurately document speech services for certain students on her caseload: [and that] [b]y

engaging in this conduct, [Plaintiff] admits that she engaged in neglect of duty within the

meaning of Education Law Section 3012." (Def. Ex. D at 3). The Stipulation also required

Plaintiff to pay a $40,000 fine and agree to a "Last Chance Provision," which states:

> If at any time prior to the last day of the 2021-22 school year, additional
> Education Law 3020-a disciplinary charges are preferred against Ms. O'Neill and
> she is determined by the appointed hearing officer to have engaged in neglect of

---

[8] "Section 3020-a charges" refers to Section 3020 of the New York Education Law, which requires schools to abstain from disciplining or removing providers "except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement covering" the provider's "terms and conditions of employment." N.Y. Educ. Law § 3020.

Case: 24-2007, 11/04/2024, DktEntry: 25.1, Page 80 of 131
Case 7:22-cv-05017-JCM    Document 63    Filed 06/26/24    Page 5 of 38

[SA-15]

duty substantially similar to that referenced in Paragraph 1 and/or for the failure
to deliver recommended [] IEP Speech and Language services to the students on
her caseload and/or failure to accurately and contemporaneously document
(within 30 days of service delivery) Speech and Language services she delivers or
is required to deliver to the students on her caseload, as defined by and subject to
law and regulation, and she is determined by the appointed hearing officer to have
engaged in this conduct, the Employee expressly agrees that the penalty will be
her termination from employment as a teacher in the District. Whether the
Employee has engaged in conduct substantially similar to that set forth in
Paragraph 1 and/or fails to deliver recommended [] IEP Speech and Language
services to the students on her caseload and/or fails to accurately and
contemporaneously document (within 30 days of service delivery) Speech and
Language services that she delivers or is required to deliver to the students on her
caseload, as defined by and subject to law and regulation, will be determined
solely by the Hearing Officer appointed pursuant to the procedures of New York
State Education Law Section 3020-a. Ms. O'Neill shall be provided all of the due
process rights afforded to a tenured teacher at the hearing. Prior to invoking this
Last Chance Agreement and claiming a violation thereof, the District agrees to
provide Ms. O'Neill with a single notice of 45 days so as to provide her with an
opportunity to cure the alleged violation(s).

(*Id.* at 6-7.)  In addition, in exchange for the District dismissing the charges, Plaintiff agreed to

waive "any and all claims that she might otherwise have asserted through the date of this

Agreement, as set forth above, pursuant to Title VII of the Civil Rights Act of 1964 with

Amendments, the Age Discrimination and Employment Act, Section 504 of the Rehabilitation

Act of 1973, Title I of the Americans with Disabilities Act of 1990, the New York State Human

Rights Law, 42 U.S. Code Section 1983, as well as any other claims or causes of action other

than those necessary to enforce the provisions of this Agreement." (*Id.* at 8.)  Finally, both

parties agreed to:

issue releases in favor of the other in connection with the matters covered by this
Settlement Agreement. With respect to [the Plaintiff], the Release concerns any
claims, charges, suits, etc., whether known or unknown, which the District could
have brought against [her] as of the effective date of this Agreement. With respect
to the District . . . [the Plaintiff] releases the District . . . from any and all legal
liability in connection with the Employee's employment in the District through
the effective date of this Agreement.

# [SA-16]

(*Id.*).  Plaintiff does not deny the existence of the Stipulation, or that she signed it, but claims that

she never admitted to the misconduct as stated in the Stipulation and that the circumstances of

the prior charges are not substantially similar to the circumstances giving rise to this lawsuit, as

required for the District to enforce the Last Chance Provision. (Pl. 56.1 Resp. ¶¶ 33-45).

## D.    The Circumstances Surrounding the Current Dispute

## 1.    IEP Direct Records

In or about January 2020, Ms. Orwick discovered that Plaintiff had not kept her IEP

Direct records up to date. (Def. 56.1 ¶ 47).  Consequently, the District scheduled a disciplinary

meeting with her to examine her session notes for the prior school year. (*Id.* ¶ 48).  This meeting

was postponed indefinitely when the District closed due to the COVID-19 pandemic and began

educating students virtually. (*Id.* ¶ 50).  When the District reopened, it moved to a hybrid

teaching model for the 2020-2021 school year, which required students to attend both

synchronous and asynchronous classes. (*Id.* ¶ 53).  Synchronous classes required students to

attend a live class via Google Meet, whereas asynchronous classes allowed providers to post

work for students to complete on their own time by a date certain. (*Id.*).  Most teachers and

providers used the time provided by asynchronous classes to catch up on their records. (*Id.* ¶

54).[9]

The pandemic also changed how Plaintiff and similarly situated providers treated

students who required IEP mandated speech therapy.  Students were now treated, at least in part,

virtually.  As a condition of providing these virtual sessions, the District required students' legal

guardians to execute teletherapy consent forms. (*Id.* ¶ 56).  These students were still treated even

---

[9] The District claims that it instituted "Asynchronous Wednesdays" during the COVID-19 pandemic where no one
was "physically in the building and all classes were done asynchronously." (Def. 56.1 ¶ 51).  However, Plaintiff
argues that only students were absent those days and that she was physically present along with other "staff." (Pl.
56.1 Resp. ¶ 55).

if they did not return the consent form, but the District required the providers to note the absence of a completed consent form in IEP Direct. (*Id.* ¶ 57).  The District claims that Plaintiff failed to do this for many of the students assigned to her during the 2020-2021 school year. (*Id.* ¶¶ 51, 58).  Plaintiff claims that this is incorrect and that she was marking students who did not return consent forms as "not available" in IEP Direct. (Pl. 56.1 Resp. ¶ 57).

This issue came to a head in February 2021, when Mr. Brancato began investigating the completeness of Plaintiff's attendance records. (Def. 56.1 ¶¶ 59-60).  He informed Ms. Orwick of his concern that Plaintiff was not recording notes regularly. (*Id.*).  Ms. Orwick then checked IEP Direct, which confirmed Mr. Brancato's suspicion, showing that Plaintiff's records were incomplete. (*Id.* ¶ 62).  Ms. Orwick notified Plaintiff that she needed to get her records up to date.  (*Id.* ¶ 63).  Plaintiff responded that she was working on it but was "very busy here and personally" and was trying to avoid taking time off since they were "very short handed." (Pl. 56.1 Resp. ¶ 64; Def. Ex. HH).  The District claims that other than this e-mail, Plaintiff did not mention having difficulty completing her records. (Def. 56.1 ¶ 65).  Plaintiff disputes this and claims that she told Ms. Brooks and Assistant Principal Arlene Almobobar that she was struggling to keep up with her records given her workload and personal issues. (Pl. 56.1 Resp. ¶ 65).  A month later, Ms. Orwick ran a report from IEP Direct for Plaintiff's records from September 1, 2020 through March 26, 2021. (Def. 56.1 ¶ 67).  The report listed, among other things, "how many sessions had been accounted for—either by indicating that the service was provided or that the student was absent, the provider was absent, the school was closed, etc." (*Id.* ¶ 68).  The report disclosed that Plaintiff only recorded notes for a small number of her student's required sessions, and that in total she failed to account for 887 sessions. (*Id.* ¶¶ 69-73).  Plaintiff does not dispute that this is what the report says but argues that the number of sessions required

per student was a goal, and that the report was not accurate because it did not include students who failed to return consent forms and were marked as "not available" in IEP Direct, even though they were provided therapy anyway. (Pl. 56.1 Resp. ¶¶ 73, 163). However, Defendant submitted documentary evidence from the vendor that generated the IEP report, indicating that it did include students marked "not available" in the fields of the report generated. (Def. Ex. LLL at 1).

Based on this report, Ms. Brooks and Mr. Brancato directed Plaintiff and her union representative to attend a meeting with them on March 17, 2021. (Def. 56.1 ¶ 74). The purpose of the meeting was to discuss Plaintiff's alleged failure to keep her records current. (*Id.* ¶ 75). Plaintiff chose not to make a statement at this meeting. (*Id.* ¶ 77). Subsequently, on April 5, 2021, the District gave Plaintiff a 45-day notice, pursuant to the terms of the Last Chance Provision in the Stipulation, requiring her to catch up on all outstanding records by the end of the 45-day period. (*Id.* ¶ 78). On May 20, 2021, Ms. Orwick ran a new report from IEP Direct for the same time period used previously—September 1, 2020 to March 26, 2021. (*Id.* ¶¶ 80-81). This report revealed that Plaintiff failed to get her records up to date and that 869 sessions remained undocumented. (*Id.* ¶ 82). Plaintiff refutes this allegation in part, arguing that she completed "95-98 percent" of her IEP Direct records, which would be current by the end of the school year, and did complete the Google Spreadsheet, (*see infra* Section I.D.2), in its entirety, which she prioritized since "[n]o one ever explained what item should take priority." (Pl. 56.1 Resp. ¶¶ 80-83). However, further investigation by Ms. Orwick revealed that Plaintiff accessed the IEP Direct system infrequently, and sometimes not for many months. (Def. 56.1 ¶¶ 86-88). Plaintiff denies this allegation and claims, without evidence, that IEP Direct reports "can be easily manipulated." (Pl. 56.1 Resp. ¶ 88).

On June 10, 2021, Plaintiff and her union representative met with the District again to discuss her deficient records. (Def. 56.1 ¶ 91). Plaintiff, again, declined to make a statement on her own behalf. (*Id.* ¶ 92). The District then filed formal charges against Plaintiff pursuant to the Last Chance Provision, for: (1) failing to keep her records current for "approximately 869 sessions of mandated speech therapy for approximately 47 students during the 2020-2021 school year;" and (2) failing to meet the prior 45-day directive to get those records up to date. (*Id.* ¶ 93). She was suspended while the charges were adjudicated, and a hearing was held on January 26, 2022. (*Id.* ¶¶ 94-95). After this hearing, on January 27, 2022, Ms. Orwick ran another IEP Direct report for the same September 1, 2020 through March 26, 2021 period, which showed that Plaintiff still had not updated all her records and failed to account for approximately 669 sessions. (Def. 56.1 ¶¶ 84-85; Def. Ex. E). Plaintiff argues that this report suffered from the same problem as the prior reports since it did not include students marked unavailable because they failed to return the consent form, even though services were rendered anyway. (Pl. 56.1 Resp. ¶ 84).

Ultimately, on May 9, 2022, a hearing officer found that Plaintiff engaged in the misconduct alleged, and the District then terminated her employment pursuant to the Last Chance Provision of the Stipulation. (Def. 56.1 ¶ 96). The termination was effective as of May 10, 2022. (*Id.* ¶ 97).

**2.      The Google Attendance Spreadsheet**

The pandemic changed how attendance was recorded by providers at SMS. (Def. 56.1 ¶ 98). Taking attendance is mandatory in the District, but teachers and providers recorded it differently. (*Id.*). Prior to the pandemic, classroom teachers used a program designed for recording attendance called Infinite Campus, while pull-out service providers (*i.e.* teachers like

## [SA-20]

Plaintiff who provided services to students by pulling them out of their regular class) did not have access to that program. (*Id.* ¶¶ 99-103). When Mr. Brancato realized pull-out service providers did not have a system for recording attendance regularly and sharing it with the school's main office,[10] he instituted a new system on February 22, 2021, whereby Plaintiff, and similar providers at the school, were required to input student attendance in a Google Spreadsheet daily. (*Id.* ¶¶ 109-12). Plaintiff and her peers were also required to input all prior attendance records for the school year into the Google Spreadsheet by March 3, 2021, which required them to look at their IEP Direct records to determine which students attended therapy sessions and then transfer that information to the spreadsheet. (*Id.* ¶¶ 113-14, 119).

The parties do not agree on the burden the new system placed on providers. Defendant alleges it should have only taken "an average of 10 minutes to complete the Google Spreadsheet log each day," and that no other providers struggled to keep up. (*Id.* ¶¶ 116-18). Plaintiff disputes this and argues that it took her approximately "50 minutes per day [to complete the spreadsheet]." (Pl. 56.1 Resp. ¶ 116). In addition, Plaintiff argues that she was: (i) the only speech therapist in the District that had to complete the Google Spreadsheet; (ii) the only African American speech therapist at SMS that had to do so; and (iii) the only provider that had to complete the spreadsheet in addition to having to cover classes. (*Id.* ¶ 107). The District maintains that all pull-out providers at SMS, including non-African Americans at the school (such as occupational therapists, physical therapists and school psychologists), were required to complete the Google Spreadsheet, and Plaintiff was the only African American speech therapist required to do so because she was the only speech therapist assigned to the school and the requirement was limited to providers at that school. (Def. 56.1 ¶¶ 23-25, 107, 113). The District

---

[10] Plaintiff contends that this is incorrect because "the main office has access to IEP Direct and the teachers would input into Infinite Campus the pullout or push in service for the student." (Pl. Decl. ¶ 46).

[SA-21]

further alleges that no other providers complained about the new spreadsheet, (*id.* ¶ 118), but Plaintiff points to an e-mail from the school psychologist where she states that "it will take a great deal of time" to get her attendance records inputted to rebut that claim, (Pl. 56.1 Resp. ¶ 118; Pl. Ex. 3).

Ultimately, Plaintiff was unable to complete the spreadsheet by March 3, 2021, and was forced to meet with Mr. Brancato and Ms. Brooks as a result. (Def. 56.1 ¶ 122).  They gave her two additional days to complete the spreadsheet, which was then extended numerous times to March 25, 2021. (*Id.* ¶¶ 123-32).  The District argues that Plaintiff struggled to complete the Google Spreadsheet because her IEP Direct records were incomplete, so she was unable to import that data into the new Google Spreadsheet. (*Id.* ¶ 133).  Plaintiff disputes this and claims that she did complete the Google Spreadsheet by the end of the 2020-2021 school year, and "had about 95-98 percent of IEP [D]irect completed[.]" (Pl. 56.1 Resp. ¶ 133).  Further, she argues that the District did not tell her whether IEP Direct should be prioritized over the Google Spreadsheet, and since the spreadsheet appeared first in a list of bulleted "outstanding matters" given to her, she assumed that was the priority. (*Id.*).  SMS stopped using the Google Spreadsheet at the end of the 2020-2021 school year when Plaintiff filed a grievance due to the additional work it required. (Pl. 56.1 Resp. ¶ 118; Pl. Decl. ¶ 24).

**3.      Plaintiff's Workload**

A central tenant of Plaintiff's argument is that the District discriminated against her by increasing her workload to the point where she could no longer keep up with her recordkeeping responsibilities. (Pl. 56.1 Resp. ¶ 141).  The District claims that she never had over 65 students in a single school year, and that "even if she did, the Settlement waived any claim arising from this matter." (Def. 56.1 ¶ 142).  Plaintiff admits that this is correct, but that "it is still relevant

## [SA-22]

background information" for her current allegations of racial discrimination. (Pl. 56.1 Resp. ¶ 142).

In addition, Plaintiff claims that the District discriminated against her by requiring her to cover classes during the pandemic even though "no other speech therapist (none who were African-American)" and "no other traveling service provider except Plaintiff" were required to do so. (*Id.* ¶¶ 147-49). In response, Defendant argues that all full-time providers working at SMS were required to cover classes during the pandemic, and the only reason no other speech therapist or traveling service provider was required to do so is that there were no others assigned to SMS in the 2020-2021 school year on a full-time basis. (Def. 56.1 ¶ 151). For example, SMS's physical therapist and occupational therapist were working on an "as needed" basis, so were not assigned "building duties during the day."[11] (*Id.*).

### 4.   Plaintiff's Other Allegations of Misconduct by the District

Plaintiff's Complaint contains several other allegations of improper treatment. First, Plaintiff alleges that she was subject to "microscopic scrutiny" by a prior supervisor, who followed her around. (Pl. 56.1 Resp. ¶¶ 137-38). Defendant denies that this is true, and the parties agree that because this supervisor resigned from the District in 2017, any alleged misconduct would have been covered by the Settlement and therefore is not actionable in this case. (*Id.* ¶¶ 139-40).

Second, Plaintiff argues that the District discriminated against her by denying her request during the 2020-2021 school year to come to SMS late due to family obligations. (*Id.* ¶ 152).

---

[11] Plaintiff also claims that she was previously required to cover speech therapy sessions at other schools prior to 2020-2021, and that she requested to remain at SMS instead. (Pl. 56.1 Resp. ¶¶ 143-46). The parties agree that the District granted this request and that any claims related to allegedly improper assignments prior to the 2020-2021 school year were covered by the releases in the Settlement. (*Id.*). However, Plaintiff claims that it is "relevant background information regarding her claims of race discrimination because it shows disparate treatment based on race." (*Id.*).

# [SA-23]

The District claims that they accommodated Plaintiff by switching her schedule to allow her to begin her day at San Miguel, which was closer to her youngest son's school and that, in any event: (i) Plaintiff's older son had a driver's license and vehicle at the time and often took Plaintiff's youngest child to school; and (ii) no other teacher was allowed to come to school late due to childcare obligations, except part-time teachers pursuant to the Families First Coronavirus Response Act ("FFCRA"). (Def. 56.1 ¶¶ 153-56). Plaintiff counters that San Miguel was not closer to her youngest child's school and that her older son only drove her youngest child to school when she could not get a sitter. (Pl. 56.1 Resp. ¶¶ 154-56). However, she submits no documentary evidence to support these assertions. (*Id.*).

Third, Plaintiff argues that she was discriminated against when the school refused to punish a student who made "inappropriate comments on his Google classroom" towards her. (Docket No.1 ¶ 68). In an e-mail, the student asked Plaintiff to send him "the fricken class code" to "do my god dam homework," and referred to her as a "boomer." (Def. Ex. HHH at 7). Neither party disputes that these comments were made or that Plaintiff then contacted the student's mother who apologized for her son's conduct. (Pl. 56.1 Resp. ¶¶ 157-60). However, Plaintiff alleges that when she told Mr. Brancato about these comments, he refused to punish the student. (Docket No. 1 ¶ 68).

## E.    State Court Proceedings

On May 18, 2022, Plaintiff filed a proceeding pursuant to Articles 75 and 78 of the New York Civil Practice Law and Rules, claiming that the hearing officer's decision recommending her termination was arbitrary and capricious. (*See* Def. Ex. KKK[12]). The District moved to

---

[12] *See Christa O'Neill v. Newburgh Enlarged City Sch. Dist.*, Index No. EF002886-2022 (Sup. Ct., Orange Cnty.).

dismiss, and on February 24, 2023, the Supreme Court of New York, Orange County, (the

"Orange County Court"), denied the motion and granted the petition, holding that:

1)  "[t]he circumstances of [Plaintiff's] prior case relating to the 2016-2017 and 2017-2018

school years could not have been substantially similar to the circumstances during the

2020-2021 school year due to covid," thus the Last Chance Provision could not have

been the basis for her termination, (Pl. Ex. 1 at 9);

2)  "the past performance by petitioner prior to Covid cannot determine the circumstances of

the current charges, for the 2020-2021 school year," (*id.*);

3)  "[e]nforcing the exact terms of the Last Chance [Provision] would be unfair given the

extraordinary circumstances imposed by the Covid pandemic, which could not possibly

have been foreseen when petitioner entered into the agreement in 2019," (*id.* at 10); and

4)  the hearing officer improperly considered and found Plaintiff guilty of alleged

misconduct in January 2020, which was "not within the time frame that petitioner ha[d]

been charged with" and, therefore, violated her due process rights, (*id.* at 9-10).

Defendant does not dispute that these were the central holdings in the Orange County Court's

decision but argues that they have no bearing on this case, since the state court proceeding did

not include allegations of race discrimination, which is the basis of this case. (Docket No. 43 at

29-30).

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, the Court must grant summary

judgment "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.

v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute as to a material fact "exists for summary

# [SA-25]

judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012) (citation and internal quotations omitted).

In reviewing a motion for summary judgment, the Court "must draw all reasonable inferences in favor of the [non-moving] party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (internal citations omitted). That said, the Court may not weigh the evidence or determine the truth of the matter, but rather conducts "the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250. The moving party bears the initial burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). Under federal law, the moving party may meet its burden of proof simply by pointing to the absence of evidence to support an essential element of the plaintiff's claim. *See Tenay v. Culinary Teachers Ass'n of Hyde Park*, 281 F. App'x 11, 12-13 (2d Cir. 2008) (summary order) ("[T]he moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citation and internal quotations omitted). Therefore, Defendant may meet its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case," but need not "raise a *prima facie* case." *Hughes v. U.S.*, No. 12 Civ. 5109 (CM), 2014 WL 929837, *4 (S.D.N.Y. Mar. 7, 2014) (quoting *Celotex*, 477 U.S. at 325).

[SA-26]

Once the moving party has met its initial burden, the burden shifts to the non-moving party to "present evidence sufficient to satisfy every element of the claim." *Holcomb*, 521 F.3d at 137. "The non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial,'" *id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 249-50), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In doing so, Plaintiff "'may not rely on conclusory allegations or unsubstantiated speculation,' but must support the existence of an alleged dispute with specific citation to the record materials." *Hughes*, 2014 WL 929837, at *3 (internal citations omitted); *see also* Fed. R. Civ. P. 56(c). Additionally, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. If the non-moving party fails to establish the existence of an essential element of the case on which it bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

In the Southern District of New York, the party moving for summary judgment must submit a short and concise statement of material facts it contends are undisputed, supported by evidence that would be admissible at trial. Local Civ. R. 56.1. The party opposing summary judgment must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Civ. R. 56.1(c); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."). However, "uncontested fact[s] cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement"—in the absence of

Case: 24-2007, 11/04/2024, DktEntry: 25.1, Page 92 of 131
Case 7:22-cv-05017-JCM    Document 63    Filed 06/26/24    Page 17 of 38

[SA-27]

citations or "where the cited materials do not support the factual assertions in the [s]tatements."

*Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations and internal quotations

omitted), *abrogated on other grounds*, *Moll v. Telesector Res. Grp., Inc.*, No. 20-3599, 2024 WL

820179 (2d Cir. Feb. 28, 2024). Furthermore, the Court is "not required to consider what the

parties fail to point out." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)

(citations and internal quotations omitted).

## III.    DISCUSSION

### A.    Race Discrimination Under Title VII

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to

discriminate against any individual with respect to compensation, terms, conditions, or privileges

of employment, because of such individual's race, color, religion, sex or national origin." 42

U.S.C. § 2000e–2(a)(1). Employment discrimination claims under Title VII are reviewed under

the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973). *See also Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 330-31

(S.D.N.Y. July 21, 2020). "Although intermediate evidentiary burdens shift back and forth

under this framework, the ultimate burden of persuading the trier of fact . . . remains at all times

with the plaintiff." *Reeves*, 530 U.S. at 143 (internal quotations omitted).

First, a plaintiff must establish a *prima facie* case of discrimination. *See Jones v. Yonkers*

*Pub. Sch.*, 326 F. Supp. 2d 536, 542 (S.D.N.Y. 2004). If the plaintiff satisfies his *prima facie*

burden, a presumption of unlawful discrimination is raised. *Id.* The burden then shifts to the

employer "to articulate a legitimate, clear, specific and non-discriminatory reason" for the

adverse employment action. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). If the

defendant satisfies this burden of articulation, plaintiff bears the ultimate burden of showing that the employer's stated reason was pretext for discrimination. *See Jones*, 326 F. Supp. 2d at 543.

## 1.    *Prima Facie* Case

To establish a *prima facie* case of discrimination, Plaintiff must show: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138. Plaintiff's burden in presenting a *prima facie* case is "not onerous," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and is described as *de minimis*, *see, e.g.*, *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009).

Here, Defendant concedes that Plaintiff is a member of a protected class based on her race, that she was qualified for her position as a speech therapist, and that her firing was an adverse act. (Docket No. 43 at 20) ("Defendant does not contest that Plaintiff was a member of a protected class, qualified for her position, or that her employment termination constituted an adverse act."). However, Defendant argues that Plaintiff has "failed to satisfy the other prima facie elements" of her Title VII claim, (*id.*), namely, proving that her firing "was motivated at least in part by an impermissible reason, *i.e.*, a discriminatory reason." *Pease v. Cty. of N.Y.*, 19 Civ. 7693 (KPF), 2021 WL 2651400, at **11-12 (S.D.N.Y. June 28, 2021) (citations and internal quotations omitted).

To demonstrate discriminatory intent for purposes of establishing her *prima facie* case, Plaintiff must adduce evidence supporting the inference that "discriminat[ion] was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in the employer's decision." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (emphasis in

**[SA-29]**

original).  The necessary inference may be derived from a variety of circumstances, including

"the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its

invidious comments about others in the employee's protected group; or the more favorable

treatment of employees not in the protected group; or the sequence of events leading to the

plaintiff's discharge." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009), *superseded

by statute on other grounds*, *Vogel v. CA, Inc.*, 662 F. App'x 72 (2d Cir. 2016).

      An inference of discrimination may be proven by direct or indirect evidence.  "Direct

evidence of discrimination includes, most commonly, disparaging comments regarding a

protected class." *Pease*, 2021 WL 2651400, at \*11 (citing *Littlejohn v. City of New York*, 795

F.3d 297, 312 (2d Cir. 2015)).  "Indirect evidence includes evidence that similarly situated

comparators outside of Plaintiff's protected class were treated more favorably than Plaintiff."

(*Id.*).  This requires Plaintiff to show that: (1) she was "similarly situated in all material respects

to the individuals with whom [she] seeks to compare [herself];" (2) the comparator was "subject

to the same performance evaluation and discipline standards;" and (3) the comparator engaged in

comparable conduct. *Id.* (internal quotations omitted).

      Here, Plaintiff argues that while there is no direct evidence of discrimination by the

District, she has met her initial burden because "[t]he totality of the circumstances [] give rise to

an inference of discrimination . . . [and] there is a genuine issue of fact as to whether Plaintiff's

termination was at least in part the result of racial animus." (Docket No. 51 at 24).  Specifically,

she argues that: (1) Ms. Brooks, the principal at SMS, testified that the District "discriminated

against her [Ms. Brooks] based on race (African-American) during the time period relevant

here;" (2) the District has a long history of "refusing to provide [Plaintiff] with privileges,

conditions, and accommodations that they provided similarly situated peers, including grossly

## [SA-30]

excessive workloads, school transfers, inappropriate scrutiny, and refusal of reasonable child

care accommodations;" and (3) that during the 2020-2021 school year, the District unreasonably

increased her responsibilities in comparison to her peers, knowing she would fall behind and fail

to meet their expectations. (*Id.* at 24-25).  In response, the District contends that Plaintiff has

failed to establish discriminatory intent because: (1) "Plaintiff was hired and fired by the same

entity, the Board;" (2) she has not identified "similarly situated comparators to show evidence of

discriminatory intent;" and (3) there is no evidence that the District gave her additional

responsibilities during the 2020-2021 school year due to her race, or that the increase was

disproportionate to other similarly-situated providers at SMS. (Docket No. 43 at 22-25).

First, Plaintiff's argument that Ms. Brooks' deposition testimony supports an inference of

discrimination against Plaintiff is unavailing.  While Ms. Brooks testified that she believes the

District discriminated against her based on her race and gender, by not increasing her pay

"according to a scale of others" even though it increased her "responsibilities compared to

others," she did not offer specifics as to the basis for this contention nor did she express a belief

that Plaintiff was similarly discriminated against. (Def. Ex. L at 17-18).  As a result, her

statements do not constitute evidence of discriminatory motive against Plaintiff. *See Lulo v. OTG

Mgmt., LLC*, 19 Civ. 3776 (PAE), 2022 WL 409224, at *5 (S.D.N.Y. Feb. 10, 2022) (holding

that a "sparsely developed circumstance" of alleged discrimination against another employee is

"insufficient to permit an inference" of discrimination); *Divers v. Metro. Jewish Health Sys.*, No.

06-CV-6704 (RRM)(JMA), 2009 WL 103703, at *17 (E.D.N.Y. Jan. 14, 2009) ("general

statements" by a coworker consisting "largely of conclusory allegations and personal opinions"

in support of a plaintiff's discrimination claim are insufficient to establish racial animus)

(collecting cases), *aff'd*, 383 F. App'x 34 (2d Cir. 2010).

# [SA-31]

Moreover, Plaintiff's argument ignores the fact that Ms. Brooks was the supervisor that initiated the disciplinary proceedings against her in 2021. (Def. 56.1 ¶¶ 74-76).  Ms. Brooks sent Plaintiff the March 11, 2021 letter informing her that she must attend a virtual meeting to discuss the IEP Direct report showing she failed to account for 887 speech therapy sessions. (*See* Def. Ex. II) (March 11, 2021 letter from Ms. Brooks informing Plaintiff that she must attend a virtual meeting that "may be disciplinary in nature").  When that meeting failed to induce a change in Plaintiff's conduct, Ms. Brooks sent her a 45-day notice on April 5, 2021, pursuant to the terms of the Last Chance Provision in the Stipulation, giving her a formal deadline by which she was required to catch up on all outstanding records. (*See* Def. Ex. JJ).  In addition, Ms. Brooks is also African American, which "undercuts Plaintiff's efforts to contend that there are disputed issues of material fact concerning her ability to prove a prima facie case of discrimination." *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 587 (W.D.N.Y. 2015), *aff'd*, 661 F. App'x 87 (2d Cir. 2016); *see also Moore v. Time Warner GRC 9*, 18 F. Supp. 2d 257, 262 (W.D.N.Y. 1998) ("the fact that [plaintiff's supervisor], possibly [plaintiff's] strongest critic and the person who initiated his termination, is African-American, is wholly inconsistent with [plaintiff's] theory that the termination decision was motivated by race.").  Thus, Ms. Brooks' testimony about her own experience with discrimination does not give rise to an inference of discrimination against Plaintiff.

Second, Plaintiff has failed to identify similarly situated comparators that were treated differently on the basis of race.  She argues that the proper comparators are speech therapists at other schools within the District because SMS did not have any other speech therapists, and she "was the only African-American speech therapist and was the only speech therapist who had to document sessions on two platforms [IEP Direct and the Google Spreadsheet]" while

simultaneously being forced "to cover classes" and take on supervisory duties. (Docket No. 51 at 26-27). Defendant responds that speech therapists at other schools are not proper comparators because: (1) Plaintiff spent the vast majority of her time at SMS; (2) Mr. Brancato, the vice-principal that instituted the Google Spreadsheets [one of the "two platforms"], only worked at SMS; and (3) other pull-out service providers like Plaintiff at SMS "were required to perform this task." (Docket No. 43 at 23).

In evaluating proper comparators, "[t]he employees' positions, job responsibilities, and reporting structures are relevant." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21 (E.D.N.Y. 2015). Even though "an employee with a different supervisor can still serve as a comparator," that employee and the argued comparator must be "subject to the same workplace standards and disciplinary procedures." *Williams v. PMA Companies, Inc.*, 564 F. Supp. 3d 32, 50 (N.D.N.Y. 2021) (internal quotation omitted). Further, while having a different supervisor is not dispositive, it is an important factor in the analysis. *See Syrkin v. State Univ. of New York*, No. 04-CV-4336 (FB)(RML), 2008 WL 4179690, at *7 (E.D.N.Y. Sept. 10, 2008) (noting that "when different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects"), *aff'd*, 370 F. App'x 150 (2d Cir. 2010); *Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 525 n.38 (S.D.N.Y. 2007) ("[a]dditionally, [the proposed comparators] had different supervisors than plaintiff, which has been recognized as a factor militating against finding individuals similarly situated"), *aff'd*, 288 F. App'x 757 (2d Cir. 2008).

Neither party disputes that Plaintiff primarily worked at SMS, that she was the only speech therapist assigned there,[13] that Ms. Brooks and Mr. Brancato were her direct supervisors

---

[13] Plaintiff also notes that she was the only African American speech therapist in the District, but this is a disparate treatment, not a disparate impact case, so statistical data alone is insufficient to establish an inference of discrimination. *See Miles v. City of New York*, No. CV-99-7365 (JGR)(LM), 2002 WL 31410346, at *4 (E.D.N.Y.

and worked only at SMS, and that the Google Spreadsheet requirement was imposed by Mr.
Brancato for all pull-out service providers at SMS. (*See* Pl. 56.1 Resp. ¶¶ 24-25, 27, 106). Thus,
a reasonable jury could not find that speech therapists at other schools in the District are proper
comparators because they had different supervisors, and Plaintiff's supervisor, Mr. Brancato,
was the person who imposed the new Google Spreadsheet requirement. *See, e.g.*, *Baity v. Kralik*,
51 F. Supp. 3d 414, 447 (S.D.N.Y. 2014) ("[t]his difference [in supervisors] is significant
enough to prevent a reasonable jury from finding that [a plaintiff's proposed comparators] were
similarly situated so as to allow the drawing of an inference of discrimination"); *Szewczyk v. Cty.
of N.Y.*, 17-CV-1884 (MKB), 2020 WL 13890927, at *14 (E.D.N.Y. Mar. 31, 2020) (same).[14]
Moreover, the entire "District experienced some shortage of teachers and substitute teachers
during the COVID-19 pandemic," so increased responsibility was not limited to Plaintiff and,
therefore, is not evidence of discrimination against her. (Def. 56.1 ¶ 147).[15]  As a result, Plaintiff
has failed to identify a similarly situated comparator that was treated differently than her on the
basis of race.

     Third, the remaining examples Plaintiff claims give rise to an inference that the District
discriminated against her on the basis of race fare no better.  For example, the fact that Mr.

---

Oct. 24, 2002) ("In a disparate treatment case where the plaintiff is an individual, as opposed to a class, statistical
data alone does not establish a prima facie case.").

[14] While Defendant avers that the proper comparator here would be other pull-out service providers assigned to SMS
that reported to Mr. Brancato and were required to complete the Google Spreadsheet, these providers did not have
the same responsibilities as Plaintiff during the 2020-2021 school year (*e.g.*, covering classes, monitoring halls, etc.)
because they were "only at SMS on an as needed basis and otherwise travelled between the other schools to provide
services." (Def. 56.1 ¶ 151).  Thus, they are not directly comparable.  Nor would SMS teachers who had to take on
more responsibility during the 2020-2021 school year be an apt fit in this instance since they recorded attendance on
another platform and, as a result, were not required to complete the Google Spreadsheet. (*Id.* ¶¶ 99, 106).

[15] Plaintiff states that "to her knowledge no other speech therapist (none who were African-American) in the District
had addition to her duties [sic] . . . [to] cover classes, hall duty and supervisory duty." (Pl. 56.1 Resp. ¶ 147).
However, the only evidence she cites in support of that statement is her own Declaration. *See Deebs v. Alstom
Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (holding that relying "almost exclusively" on one's "own
deposition testimony . . . is insufficient to defeat summary judgment.").

**[SA-34]**

Brancato introduced the Google Spreadsheet during the 2020-2021 school year, even though Plaintiff was allegedly already recording attendance through IEP Direct and had an unsustainable increase in responsibility due to the pandemic, is insufficient to raise an inference of discrimination since he was new to the position. *See, e.g.*, *Beers v. NYNEX Material Enterprises Co.*, No. 88 CIV. 0305 (MBM), 1992 WL 8299, at *11 (S.D.N.Y. Jan. 13, 1992) ("a new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations."). Similarly, the District's denial of Plaintiff's request to come to work late at the beginning of the 2020-2021 is not evidence of discrimination since no similar requests were granted for non-African American teachers or pull-out service providers in the school district unless they were working part-time pursuant to the FFCRA. (*See* Def. 56.1 ¶ 156; Def. Ex. GGG).

Furthermore, Plaintiff's allegation regarding a student's inappropriate comments towards her does not establish an inference of discrimination. The student neither referenced nor alluded to Plaintiff's race. (Def. Ex. HHH at 7) (student asks Plaintiff to send him "the fricken class code" to "do my god dam homework," and referred to her as a "boomer."). Even if he had: (1) the student does not work for the District; (2) Plaintiff confirmed in e-mail correspondence with Mr. Brancato that she spoke to his mother "who was apologetic;" (3) Mr. Brancato asked to meet with the student when he was "physically in the building;" and (4) Plaintiff did not request further discipline against him at the time. (*Id.* at 2). Similarly, Plaintiff's complaints about not having a proper therapy room and being subject to unfair "micro scrutiny" also fail to raise an inference of discrimination as both complaints predate her termination by many years and were waived in the Stipulation. For example, the supervisor Plaintiff claims subjected to her to "microscopic scrutiny," (Pl. Decl. ¶ 15), resigned in 2017—years before the events complained

of in this action and the signing of the Stipulation occurred. (Def. 56.1 ¶ 139).  Thus, these

allegations are insufficient to infer discriminatory animus.  *See Cruz v. Bernstein Litowitz Berger*

*& Grossman LLP*, 20-CV-8596 (VF), 2023 WL 2691456, at *14 (S.D.N.Y. Mar. 29, 2023)

(holding that conduct that occurred in 2018, and "6 months prior to [a plaintiff's] termination [in

2019]. . . was too temporally remote" to establish "a causal nexus between the incident and [the

plaintiff's] termination"); Stipulation at 7-9 ("Employee hereby waives any and all claims that

she might otherwise have asserted through the date of this Agreement . . . pursuant to Title VII of

the Civil Rights Act of 1964).

        Finally, Plaintiff's argument that her allegations, when considered together, raise an

inference of discrimination, even if they fail to do so when considered independently, does not

cure the problem.  Plaintiff's argument is essentially that the District was committing a

continuing violation that, when viewed as a whole, demonstrates a pattern or practice of

discrimination. (Docket No. 51 at 28-30).  However, the continuing violation doctrine "is not an

independent theory of liability" and "[a] pattern or practice case is not a separate and free-

standing cause of action, but rather a method of proving a disparate treatment claim," which "is

not available to nonclass, private plaintiffs." *Tassy v. Buttigieg*, 51 F.4th 521, 530 (2d Cir. 2022)

(internal quotations omitted) (cleaned up); *see also Nieves v. Angelo, Gordon & Co.*, 341 F.

App'x 676, 679 (2d Cir. 2009) (affirming district court's finding that plaintiff "cannot state a

*prima facie* case because she fails to offer any evidence to show that her termination was

causally connected to her [protected class]") (emphasis in original); *Richardson v. New York*

*State Dep't of Corr. Servs.*, No. 97-CV-0818E (SR), 2001 WL 603705, at *7 (W.D.N.Y. May 29,

2001) (holding that summary judgment is proper where "[b]eyond conclusory assertions []

plaintiff has failed to present any issue of material fact which would suggest that the conduct

complained of was motivated by some discriminatory intent"), *aff'd*, 28 F. App'x 69 (2d Cir.

2002).[16]

      Accordingly, Plaintiff has failed to establish a *prima facie* case of race discrimination

under Title VII.

### 2.      Legitimate, Non-Discriminatory Reason for Plaintiff's Termination

      Assuming, *arguendo*, that Plaintiff has established a *prima facie* case of race

discrimination, the burden shifts to Defendant to articulate a legitimate, non-discriminatory

reason for her termination. *See Holcomb*, 521 F.3d at 138.  The "defendant must clearly set forth,

through the introduction of admissible evidence, reasons for its actions which, *if believed by the*

*trier of fact*, would support a finding that unlawful discrimination was not the cause of the

employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal

quotations omitted) (emphasis in original).  At this stage, the burden on the defendant is one of

articulation. *See Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir. 1997).  "[T]he defendant

need not persuade the court that it was actually motivated by its proffered reasons." *Id.*

      The District asserts that Plaintiff was fired for failing to document and record her speech

therapy sessions in IEP Direct for the 2020-2021 school year, as required by school policy and

the Last Chance Provision of the Stipulation. (Docket No. 43 at 21)  In response, Plaintiff argues

that the District is precluded under the doctrine of collateral estoppel from making this argument

because the Orange County Court previously held "that Plaintiff had not neglected her

responsibilities" and that "there was no basis for arguing that the Last Chance Provision had

---

[16] Defendant also argues that because Plaintiff was hired and fired by the same entity—the Newburgh City School District—there is a presumption that the decision was made without discriminatory intent. (Docket No. 43 at 15). This argument is unpersuasive as: (1) the case Defendant cites involves a plaintiff that was hired and fired by "the same supervisor" not the same entity, as in this case, *see Varno v. Canfield*, 664 F. App'x 63, 65 (2d Cir. 2016); and (2) the District hired Ms. O'Neill over a decade before it fired her, so the likelihood that the same individuals on the school board that hired her also made the decision to fire her is low.

# [SA-37]

been violated" since the pandemic rendered the 2020-2021 school year dissimilar to prior years. (Docket No. 51 at 21).

Collateral estoppel, or issue preclusion, forecloses "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *N.H. v. Me.*, 532 U.S. 742, 748-49 (2001)). "The doctrine applies if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *Parker v. Blauvelt Volunteer*, 690 N.Y.S.2d 478, 482 (N.Y. 1999). A pending appeal "does not prevent the use of the challenged judgment as the basis of collateral estoppel." *77 Water St., Inc. v. JTC Painting & Decorating Corp.*, 50 N.Y.S.3d 471, 475 (2d Dep't 2017). However, the doctrine "is [] flexible" and "can never be rigidly or mechanically applied." *Merrill v. Copeland*, 3:19-cv-1240 (BKS)(ML), 2022 WL 3212075, at *9 (N.D.N.Y. Aug. 9, 2022) (internal quotation omitted), *aff'd*, 2024 WL 119261 (2d Cir. Jan. 11, 2024).

Collateral estoppel does not apply here. First, the issues in the two proceedings are not identical. In the Orange County Court case, Plaintiff argued that the hearing officer's decision "was not supported by substantive evidence and was arbitrary and capricious, violated due process, and the penalty in light of the circumstances is shocking to ones' sense of fairness." (Docket No. 54-1 at 5). Plaintiff did not argue that the hearing officer's decision (or her subsequent termination as a result) was based on racial discrimination. Collateral estoppel is inapplicable on this basis alone. *See Ifedigbo v. Buffalo Pub. Sch.*, 13-CV-637S, 2018 WL 1256197, at *8 (W.D.N.Y. Mar. 12, 2018) (holding that where a plaintiff "did not raise his race-discrimination claims in the Article 78 proceeding, nor did the state court make any findings

concerning what role . . . race played in Defendants' decision [to fire the plaintiff]. . . not all of the issues raised in this action are the same" and collateral estopped does not apply).

Second, the Orange County Court did not make any factual findings as to whether Plaintiff actually failed to keep her IEP Direct records up to date in 2020-2021, or whether this was the District's true motivation for firing her. The court's decision was limited to holding that the hearing officer's opinion was arbitrary and capricious because she: (1) improperly "relied on the number of documents in evidence, rather than the substance of the documents;" (2) improperly considered allegations of misconduct prior to 2020 as a basis for finding that Plaintiff violated the Last Chance Provision in 2020-2021; and (3) failed to take into account the COVID-19 pandemic as a reason why applying the Stipulation would be "unfair." (Pl. Ex. 1 at 7, 9-11). Thus, the issue of whether the District's stated reason for firing her—that she failed to keep her IEP Direct records current in 2020-2021—is legitimate and non-discriminatory was not fully and fairly litigated, so collateral estoppel does not apply.[17] *Cf.*, *Gomez v. New York City Dep't of Educ.*, 21-CV-01711 (AT)(SN), 2022 WL 6564737, at *5 (S.D.N.Y. Aug. 15, 2022) ("[f]ederal courts have consistently found that a state court's determination that a termination was not arbitrary or capricious does not actually and necessarily decide the question of whether the termination decision was made with discriminatory intent where Plaintiff did not raise the issue in the Article 78 proceeding") (internal quotation omitted) (collecting cases), *report and recommendation adopted*, 2022 WL 4298728 (S.D.N.Y. Sept. 19, 2022).

---

[17] The pendency of Defendant's appeal of the Orange County Court's decision does not factor into this finding since it is well-established under New York law that appealing a decision "does not preclude the application of collateral estoppel." *Manhattan Rev. LLC v. Yun*, 16 Civ. 0102 (LAK)(JCF), 2017 WL 1330334, at *4 n.4 (S.D.N.Y. Apr. 10, 2017) (collecting cases), *report and recommendation adopted*, 2017 WL 3034350 (S.D.N.Y. July 17, 2017); *McGuinn v. Smith*, 11-CV-4761 (CS), 2012 WL 12887595, at *9 (S.D.N.Y. Sept. 7, 2012) (same).

## [SA-39]

Third, to satisfy its burden under the second step of the *McDonnell Douglas* framework, the District need not *prove* at this stage that its legitimate, non-discriminatory reason for firing Plaintiff was accurate or correct—it is sufficient to merely articulate such a reason. *See St. Mary's Honor Ctr.*, 509 U.S. at 509 ("[b]y producing evidence (whether ultimately persuasive or not) of nondiscriminatory reasons, petitioners sustained their burden of production[.] . . . For the burden-of-production determination necessarily *precedes* the credibility-assessment stage") (emphasis in original); *Szuszkiewicz v. JPMorgan Chase Bank*, 257 F. Supp. 3d 319, 326 (E.D.N.Y. 2017) ("At this stage, the employer need only articulate—but need not prove—the existence of a nondiscriminatory reason for its decision.").  Therefore, even if the Orange County Court had held that Plaintiff satisfied her record-keeping responsibilities in 2020-2021 and did not violate the Last Chance Provision as a result, that holding would go to the potentially pretextual nature of the District's reason for firing her, which is the third step under *McDonnell Douglas* framework. *See McDonnell Douglas Corp.*, 411 U.S. at 804.

As a result, by stating that Plaintiff was fired because she failed to update IEP Direct during the 2020-2021 school year, not due to her race, Defendant has satisfied its burden of articulation.  *See, e.g.*, *Ragin v. E. Ramapo Cent. Sch. Dist.*, 417 F. App'x 81, 82 (2d Cir. 2011) (citing plaintiff's "failure to complete a substantial amount of her assigned work" as a legitimate, non-discriminatory reason for her termination); *Nieves*, 341 F. App'x at 679 (noting that "failure to complete assigned tasks" is a legitimate non-discriminatory reason for an employee's termination); *Edwards v. Rochester Inst. of Tech.*, Case # 10-CV-6553 (FPG), 2018 WL 1569357, at **17-18 (W.D.N.Y. Mar. 29, 2018) (holding that firing plaintiff because her "work deficiencies . . . did not improve" after she was given "a written warning" constitutes a "legitimate, nondiscriminatory reason . . . [for] ultimately terminating her employment").

Accordingly, Defendant has satisfied its burden under the second step of *McDonnell Douglas* by pointing to a legitimate, non-discriminatory reason for firing Plaintiff.

**3.      Evidence of Pretext**

Since Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's termination, the burden now shifts back to Plaintiff to offer evidence that would allow a rational juror to conclude that the District's purported reason for terminating her is pretext for race discrimination. *See Hicks*, 509 U.S. at 507-08.  "To show pretext, a plaintiff must submit admissible evidence showing circumstances to permit a rational finder of fact to find that the defendant's conduct was motivated in whole or in part by discrimination." *Daly v. Westchester Cnty. Bd. of Legislators*, 19-CV-04642 (PMH), 2023 WL 4896801, at *6 (S.D.N.Y. Aug. 1, 2023) (quotation omitted).  The evidence offered must "go beyond self-serving and conclusory allegations that the defendants' proffered reasons were false." *Id.*  However, falsity itself is not enough, Plaintiff must prove both that the reason was false "and that discrimination was the real reason." *Messinger v. JPMorgan Chase Bank, N.A.*, 126 F. Supp. 3d 376, 385 (S.D.N.Y. 2015).

Here, Plaintiff argues that Defendant's stated justification for firing her was false and her termination was motivated by racial animus because: (1) the IEP Direct reports generated by Ms. Orwick are inaccurate and "[t]here is evidence that the reports can be specifically customized and potentially manipulated," (Docket No. 51 at 29); (2) the District is exaggerating the extent to which she fell behind on her record-keeping responsibilities, and the only reason she fell behind at all was "because of her onerous duties and responsibilities during the 2020-2021 COVID school year," (*id.* at 26); (3) the District did not tell her that IEP Direct was to be prioritized over the Google Spreadsheet and the Google Spreadsheet "was not the requisite platform to be used by the Special Education Department," (*id.* at 22); and (4) "there was no appropriate legal

## [SA-41]

rationale to argue that Plaintiff's conduct triggered the application of the Last Chance Provision," (*id.* at 26). Defendant offers admissible evidence to rebut each of these allegations.

Plaintiff's claim that the IEP Direct reports were inaccurate and "potentially manipulated" lacks evidentiary support besides her own, self-serving testimony. (Pl. 56.1 Resp. ¶¶ 85-90). In contrast, Defendant cites to: (i) testimony from Ms. Orwick, the individual that generated the September 1, 2020 through March 26, 2021 reports, confirming that they show Plaintiff failed to enter data for "over 800" of her speech therapy sessions, (Def. Ex. E at 79-92, 103-10); (ii) the reports themselves, which show, on their face, that Plaintiff failed to enter notes in IEP Direct for hundreds of students during the 2020-2021 school year, (*see, e.g.*, Def. Ex. EE (IEP Direct Attendance Report showing that as of May 20, 2021, Plaintiff failed to record notes for over 800 therapy sessions); Def. Ex. LL (IEP Direct Attendance Report showing that as of June 30, 2021, Plaintiff had still failed to record notes for over 600 therapy sessions); Def. Ex. NNN (list of students assigned to Plaintiff for 2020-2021); Def. Ex. RRR (IEP Direct Summary of Session Notes for Plaintiff in 2020-2021)); and (iii) IEP Direct Access Reports, showing Plaintiff had failed to even log into the system for extended periods of time during the 2020-2021 school year,[18] (Def. Ex. E at 475-80 and Def. Ex. MM, NN). Thus, Plaintiff's conclusory allegations of inaccuracy are insufficient to establish pretext.

The same is true for Plaintiff's argument that the IEP Direct reports overstate her recordkeeping deficit. She argues that the reports do not include records for students who she marked "not available" in IEP Direct because they failed to return their teletherapy consent form.

---

[18] Plaintiff denies this allegation, arguing that IEP Direct "can be easily manipulated," and that she provided therapy to more students than indicated in the report. (Pl. 56.1 Resp. ¶¶ 68, 93). However, she fails to point to evidence substantiating her allegation that it was manipulated. (*Id.*) (citing to ¶ 38 of her Declaration, which also fails to cite to admissible evidence supporting the notion that the report was "manipulated."). Moreover, Plaintiff's argument proves Defendant's point as there would be no way for the District to know if she was providing therapy to students unless she recorded it as required.

## [SA-42]

However, again, Plaintiff cites only to her own testimony to support this allegation, (Pl. 56.1 Resp. ¶ 84), and ignores: (1) the testimony from Ms. Orwick that, "both student not available and student absent are the data" included in the "student absence field," (Def. Ex. E at 500-05); and (2) e-mails from the IEP Direct vendor confirming that "Student Absence," "Provider Absence," "Student Not Available," and "Provider Not Available" were included "in the Student Absence and Provider Absence columns on the report," (Def. Ex. LLL at 1). Further, the IEP Direct session notes submitted for students that had submitted teletherapy consent forms, show that in many cases Plaintiff continued to mark them not available anyway. (Docket No. 60 ¶ 3; Def. Ex. RRR, SSS).

Plaintiff's argument also overlooks a key point: even if the reports were inaccurate, that alone is not sufficient to establish pretext—Plaintiff must also prove that the real reason she was fired was because of her race. *Messinger*, 126 F. Supp. 3d at 385; *see also Cope v. Wal-Mart Stores E., LP*, 3:15-CV-01523 (CSH), 2017 WL 2802722, at *14 (D. Conn. June 28, 2017) ("[m]erely showing that an employer's decision was wrong or mistaken is not enough to discredit the employer's proffered reasons for termination because the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.") (citation and internal quotation omitted). Here, Plaintiff maintains that the increase in her responsibilities due to the COVID-19 pandemic prevented her from keeping her records up to date, and, thus, establishes pretext. However, this ignores that all teachers at SMS, including non-African Americans, had an increased workload during the pandemic. (Def. Ex. H) (Plaintiff confirming that other teachers had to cover classes during the pandemic).[19] It also ignores that Plaintiff's failure to record required notes was an issue before

---

[19] Plaintiff argues in her response to Defendant's Rule 56.1 Statement that she was not a teacher, so these are not proper comparators. (Pl. 56.1 Resp. ¶ 147). This is true, but overlooks that Plaintiff was the only full-time pull-out

Case: 24-2007, 11/04/2024, DktEntry: 25.1, Page 108 of 131
Case 7:22-cv-05017-JCM   Document 63   Filed 06/28/24   Page 33 of 38

[SA-43]

the 2020-2021 school year, (Def. 56.1 ¶¶ 32-50), and the District asked to meet with her regarding the problem before the school shut down due to the COVID-19 pandemic, (Def. Ex. BB) (letter from the District dated January 10, 2020, directing Plaintiff to attend a meeting to discuss her session notes).  Therefore, Plaintiff has failed to show that the District's reliance on her poor recordkeeping to justify her termination was simply pretext to fire her based on race.

Furthermore, Plaintiff's argument that the Google Spreadsheet caused her to fall behind on IEP Direct records, and that the District's subsequent decision to direct Mr. Brancato to stop using it is evidence of pretext is not supported by the record. (Docket No. 51 at 24-25).  As an initial matter, Plaintiff's struggle to keep her IEP Direct records up to date long predates Mr. Brancato's hiring and his introduction of the Google Spreadsheet. (*See* Def. 56.1 ¶¶ 32-50; Def. Ex. D (the Stipulation); Def. Ex. I (Mr. Brancato testifying that he became Assistant Principal at SMS in 2018)).  Moreover, Plaintiff was not the only pull-out service provider at SMS required to complete the Google Spreadsheet, and Mr. Brancato testified that those other providers did not similarly fall behind. (Def. 56.1 ¶¶ 106-07 (collecting references to testimony confirming that all pull-out service providers at SMS were required to complete the Google Spreadsheet); ¶ 118 (collecting references to testimony confirming other pull-out service providers at SMS completed their logs without issue)).

Plaintiff's argument that no other speech therapists in the District had to complete the Google Spreadsheet is inapposite because she was the only speech therapist assigned to SMS at the time and Mr. Brancato only worked at SMS. (Def. Ex. I at 12, Pl. 56.1 Resp. ¶ 25). Similarly, her argument that Mr. Brancato could have just used IEP Direct records to obtain the

---

service provider at SMS during the pandemic, so looking at whether other pull-out service providers who were "only at SMS on an as needed basis," (Def. 56.1 ¶ 151), during the 2020-2021 school year had a similar increase in responsibility would not shed light on the District's reasons for her increased workload.

attendance information sought is misleading, since Plaintiff admits she also failed to keep those records current. (Docket No. 51 at 26) (admitting she "fell behind because of her onerous duties and responsibilities during the 2020-2021 COVID school year.").  Nor does the District's decision to direct Mr. Brancato to cease using the Google Spreadsheet make his prior introduction of it pretextual—new supervisors are allowed to create novel assignments and programs that differ from prior supervisors. *See Amley v. Sumitomo Mitsui Banking Corp.*, No. 19 Civ. 3777 (CM)(BCM), 2021 WL 4429784, at *17 (S.D.N.Y. Sept. 27, 2021) ("A change in management's evaluation of an employee's performance cannot by itself raise an inference of pretext, and such an inference is even less permissible when a new supervisor is appointed, who is entitled to set his own standards and agenda") (internal quotation omitted).

Finally, Plaintiff erroneously argues that her failure to update IEP Direct during the 2020-2021 school year cannot be the basis for her termination under the Last Chance Provision of the Stipulation because the pandemic rendered it dissimilar to her prior misconduct. (Docket No. 51 at 26).  First, Paragraph 1 of the Last Chance Provision, detailing the substance of Plaintiff's prior misconduct, makes no reference to the volume of records she failed to complete or number of other tasks on her plate when she was previously disciplined. (Def. Ex. D ¶ 1) ("Ms. O'Neill admits that during the 2016-17 and 2017-18 school years she did not accurately document speech services for certain students on her caseload.").  Therefore, the phrase "substantially similar" in the Last Chance Provision refers solely to her failure to previously complete IEP Direct records in a timely manner. *See Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 41 (2d Cir. 2019) ("[a] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.").

Second, even if Plaintiff was correct about the meaning of "substantially similar," she fails to acknowledge the context in which that phrase is used. The Last Chance Provision states,

> If at any time prior to the last day of the 2021-22 school year, additional Education Law 3020-a disciplinary charges are preferred against Ms. O'Neill and she is determined by the appointed hearing officer to have engaged in neglect of duty substantially similar to that referenced in Paragraph 1 and/or . . . [for] failure to accurately and contemporaneously document (within 30 days of service delivery) Speech and Language services she delivers or is required to deliver to the students on her caseload . . . the penalty will be her termination from employment as a teacher in the District.

(Def. Ex. D ¶ 11). The clause requiring her present misconduct to be "substantially similar" to the conduct giving rise to the Stipulation is separated from the "failure to accurately and contemporaneously document" clause by "and/or." (*Id.*). Thus, the Last Chance Provision allows Plaintiff to be terminated *either* for conduct "substantially similar" to prior misconduct *or* for an entirely new "failure to accurately and contemporaneously document . . . Speech and Language services." *See Simpson v. Bell*, 557 F. Supp. 3d 365, 377 n.9 (E.D.N.Y. 2021) ("the words and/or commonly mean the one or the other or both'") (quoting *Loc. Div. 589, Amalgamated Transit Union, AFL-CIO, CLC v. Com. of Mass.*, 666 F.2d 618, 627 (1st Cir. 1981)). Therefore, the Last Chance Provision did not limit the District to terminating Plaintiff solely based on conduct that was "substantially similar" to misconduct she confessed to in the Stipulation.

Third, Plaintiff's argument that, by waiving any additional charges or claims based on her prior misconduct in the Stipulation, the District was prohibited from considering that prior misconduct in deciding whether she violated the Last Chance Provision in 2020-2021, (Docket No. 51 at 7, 34), reads conditions into the agreement that do not exist. The Stipulation only states that the parties were waiving prior "claims, charges, suits, etc." as of the effective date, not that they were erasing it from their memory entirely. (Def. Ex. D ¶ 16). Moreover, Plaintiff's

proffered interpretation renders the "substantially similar" clause, that she relies on in her other argument, entirely meaningless because the District would not be able to compare her current misconduct to the prior misconduct. Since "[t]he rules of contract construction require [the Court] to adopt an interpretation which gives meaning to every provision of the contract," Plaintiff's interpretation must be rejected. *GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 214 (2d Cir. 2010) (internal quotation omitted). Regardless, Plaintiff fails to submit admissible evidence buttressing her novel reading of the Stipulation. Consequently, she has failed to sustain her burden and raise a genuine issue of material fact for trial.

In sum, Plaintiff has failed to set forth admissible evidence demonstrating that the District's decision to terminate her based on her failure to keep IEP Direct up to date was pretextual.[20] Accordingly, Defendant's motion to dismiss Plaintiff's Title VII claim is granted.

## B.   Plaintiff's State Law Claim

Plaintiff's remaining claim arises under the NYSHRL. Defendant argues that if the Court grants summary judgment on Plaintiff's federal claim, it should "decline to exercise supplemental jurisdiction over Plaintiff's [remaining] state law claim." (Docket No. 43 at 28). In response, Plaintiff argues that the Court should retain jurisdiction because "discovery is completed, the state law claims are not novel, and the federal and state law claims are substantially identical." (Docket No. 51 at 32 n.3).

District courts "may decline to exercise jurisdiction over a claim" where it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367. The decision to exercise

---

[20] To the extent Plaintiff is also arguing pretext based on Ms. Brooks' testimony, her former student's inappropriate comments, a prior supervisor's "microscopic supervision" of her, not having a suitable therapy room, and/or the District's refusal to allow her to come to work late, those arguments fail for the same reasons they were insufficient to demonstrate discriminatory intent. *See supra* Section III.A.1; *accord Shaw v. McHugh*, No. 12-CV-6834 (CS), 2015 WL 1400069, at *12 n.17 (S.D.N.Y. Mar. 26, 2015), *aff'd*, 641 F. App'x 95 (2d Cir. 2016).

supplemental jurisdiction "is within the sound discretion of the district court." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117 (2d Cir. 2013). "Where 'all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . point toward declining to exercise jurisdiction over the remaining state law claims.'" *Fitzgerald v. We Co.*, 20 Civ. 5260 (AT), 2022 WL 952963, at *10 (S.D.N.Y. Mar. 30, 2022) (cleaned up) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998).

Here, Plaintiff's only claim arising under federal law—employment discrimination under Title VII—has been dismissed. Her remaining claim arises under state law, which "[is] subject to a different standard than" her Title VII claim, *Whitney v. Montefiore Med. Ctr.*, 21 Civ. 9623 (PAE), 2023 WL 7386400, at *27 (S.D.N.Y. Nov. 8, 2023), and may "embed[] potentially complex questions of state law." *Ebel v. G/O Media, Inc.*, 20 Civ. 7483 (PAE), 2022 WL 2359245, at *30 (S.D.N.Y. June 30, 2022); (*see also* Docket No. 51 at 19). Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim for employment discrimination and imposition of a hostile work environment under the NYSHRL.

Accordingly, Plaintiff's state law claim is dismissed without prejudice to renew in state court.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted as to Plaintiff's Title VII claim, and that claim is dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim and dismisses that

**[SA-48]**

claim without prejudice to renew in state court.  The Clerk is respectfully directed to terminate

the pending motion (Docket No. 42), enter judgment for Defendant, and close the case.

Dated:    June 26, 2024
           White Plains, New York

                              **SO ORDERED:**

                              _Judith C. McCarthy_
                              _____
                              JUDITH C. McCARTHY
                              United States Magistrate Judge

**[SA-49]**

Judgment [SA49]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
CHRISTA O'NEILL,

                                 Plaintiff,

           -against-                              22 **CIVIL** 5017 (JCM)

                                                     <u>**JUDGMENT**</u>

NEWBURGH ENLARGED CITY SCHOOL
DISTRICT,

                                Defendant.
------------------------------------------------------------------------X

                It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated June 26, 2024, Defendant's motion for summary

judgment is granted as to Plaintiff's Title VII claim, and that claim is dismissed with prejudice.

The Court has declined to exercise supplemental jurisdiction over Plaintiff's remaining state law

claim and dismisses that claim without prejudice to renew in state court; accordingly, the case is

closed.

**Dated:**  New York, New York

        June 26, 2024

                                      **DANIEL ORTIZ**
                           _____
                            **Acting Clerk of Court**

                   **BY:**        *K. Mango*
                           _____
                              **Deputy Clerk**

# 28 U.S. Code § 1291 - Final decisions of district courts

U.S. Code | Notes

prev | next

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, § 48, 65 Stat. 726; Pub. L. 85–508, § 12(e), July 7, 1958, 72 Stat. 348; Pub. L. 97–164, title I, § 124, Apr. 2, 1982, 96 Stat. 36.)

**[SA-51]**

28 USC § 1331 [SA51]

# 28 U.S. Code § 1331 - Federal question

U.S. Code   Notes

prev | next

    The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

(June 25, 1948, ch. 646, 62 Stat. 930; Pub. L. 85–554, § 1, July 25, 1958, 72 Stat. 415; Pub. L. 94–574, § 2, Oct. 21, 1976, 90 Stat. 2721; Pub. L. 96–486, § 2(a), Dec. 1, 1980, 94 Stat. 2369.)

**[SA-52]**

# 28 U.S. Code § 1367 - Supplemental jurisdiction

28 USC § 1367
[SA52]

U.S. Code | Notes

prev | next

**(a)**Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

**(b)**In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

**(c)**The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

**(1)**the claim raises a novel or complex issue of State law,

**(2)**the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

**(3)**the district court has dismissed all claims over which it has original jurisdiction, or

**(4)**in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

**(d)**The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

**(e)**As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(Added Pub. L. 101–650, title III, § 310(a), Dec. 1, 1990, 104 Stat. 5113.)

**[SA-53]**

Full Faith and Credit Clause
[SA53]

# full faith and credit

Full faith and credit is the requirement, derived from Article IV, Section I of the Constitution, that state courts respect the laws and judgments of courts from other states. This clause attempts to prevent conflict among states and ensure the dependability of judgments across the country. This does so by requiring courts to follow the judgments made on the same issue in another state. Otherwise, individuals could simply go to another state to relitigate issues that did not receive favorable judgments in previous cases, and this would result in states having different judgments that could cause competition among states. Therefore, the full faith and credit clause prevents this kind of relitigation, under the doctrines of res judicata and issue preclusion, as long as the state issuing the original judgment had jurisdiction to do so. This same principle also applies to certain kinds of laws among different states like marriage.

While the full faith and credit clause typically applies, sometimes courts may disregard the judgments of other courts based upon the prior court not having jurisdiction or following constitutionally required procedures. For example, a court in New York may ignore the judgment from California where the defendant was never properly served.

# [SA-54]
## New York State Human Rights Law (NYSHRL)

## Summary

This practice note discusses the New York State Human Rights Law (NYSHRL), which protects employees, applicants, non-employees, domestic workers, and unpaid interns from discrimination and harassment based on their membership in a protected class and prohibits retaliation. N.Y. Exec. Law § 290 et seq. Discriminatory prohibitions include protections for individuals who have a known relationship or association with a member or members of a protected category under the NYSHRL. 9 NYCRR § 466.14(c)(1).

**[SA-55]**

# Rule 56. Summary Judgment

**Rule 56**
**[SA55-SA64]**

(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

(b) Time to File a Motion. Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

(c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

**[SA-56]**

(3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

(4) issue any other appropriate order.

(f) JUDGMENT INDEPENDENT OF THE MOTION. After giving notice and a reasonable time to respond, the court may:

(1) grant summary judgment for a nonmovant;

(2) grant the motion on grounds not raised by a party;or

(3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

(g) FAILING TO GRANT ALL THE REQUESTED RELIEF. If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case.

(h) AFFIDAVIT OR DECLARATION SUBMITTED IN BAD FAITH. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court — after notice and a reasonable time to respond — may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009; Apr. 28, 2010, eff. Dec. 1, 2010.)

### NOTES OF ADVISORY COMMITTEE ON RULES—1937

This rule is applicable to all actions, including those against the United States or an officer or agency thereof.

Summary judgment procedure is a method for promptly disposing of actions in which there is no genuine issue as to any material fact. It has been extensively used in England for more than 50 years and has been adopted in a number of American states. New York, for example, has made great use of it. During the first nine years after its adoption there, the records of New York county alone show 5,600 applications for summary judgments. *Report of the Commission on the Administration of Justice in New York State* (1934), p. 383. See also *Third Annual Report of the Judicial Council of the State of New York* (1937), p. 30.

In England it was first employed only in cases of liquidated claims, but there has been a steady enlargement of the scope of the remedy until it is now used in actions to recover land or chattels and in all other actions at law, for liquidated or unliquidated claims, except for a few designated torts and breach of promise of marriage. *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 3, r. 6; Orders 14, 14A, and 15; see also O. 32, r. 6, authorizing an application for judgment at any time upon admissions. In Michigan (3 Comp.Laws (1929) §14260) and Illinois (Ill.Rev.Stat. (1937) ch. 110, §§181, 259.15, 259.16), it is not limited to liquidated demands. New York (N.Y.R.C.P. (1937) Rule 113; see also Rule 107) has brought so many classes of actions under the operation of the rule that the Commission on Administration of Justice in New York State (1934) recommend that all restrictions be removed and that the remedy be available "in any action" (p. 287). For the history and nature of the summary judgment

procedure and citations of state statutes. Clark and Samenow, *The Summary Judgment* (1929), 38 Yale L.J. 423. **[SA-57]**

*Note to Subdivision (d)*. See Rule 16 (Pre-Trial Procedure; Formulating Issues) and the *Note* thereto.

*Note to Subdivisions (e) and (f)*. These are similar to rules in Michigan. Mich.Court Rules Ann. (Searl, 1933) Rule 30.

### Notes of Advisory Committee on Rules—1946 Amendment

*Subdivision (a)*. The amendment allows a claimant to move for a summary judgment at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party. This will normally operate to permit an earlier motion by the claimant than under the original rule, where the phrase "at any time after the pleading in answer thereto has been served" operates to prevent a claimant from moving for summary judgment, even in a case clearly proper for its exercise, until a formal answer has been filed. Thus in *Peoples Bank v. Federal Reserve Bank of San Francisco* (N.D.Cal. 1944) 58 F.Supp. 25, the plaintiff's counter-motion for a summary judgment was stricken as premature, because the defendant had not filed an answer. Since Rule 12(a) allows at least 20 days for an answer, that time plus the 10 days required in Rule 56(c) means that under original Rule 56(a) a minimum period of 30 days necessarily has to elapse in every case before the claimant can be heard on his right to a summary judgment. An extension of time by the court or the service of preliminary motions of any kind will prolong that period even further. In many cases this merely represents unnecessary delay. See *United States v. Adler's Creamery, Inc*. (C.C.A.2d, 1939) 107 F.(2d) 987. The changes are in the interest of more expeditious litigation. The 20-day period, as provided, gives the defendant an opportunity to secure counsel and determine a course of action. But in a case where the defendant himself serves a motion for summary judgment within that time, there is no reason to restrict the plaintiff and the amended rule so provides.

*Subdivision (c)*. The amendment of Rule 56(c), by the addition of the final sentence, resolves a doubt expressed in *Sartor v. Arkansas Natural Gas Corp*. (1944) 321 U.S. 620. See also Commentary, *Summary Judgment as to Damages* (1944) 7 Fed.Rules Serv. 974; *Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co*. (C.C.A.2d, 1945) 147 F.(2d) 399, cert. den. (1945) 325 U.S. 861. It makes clear that although the question of recovery depends on the amount of damages, the summary judgment rule is applicable and summary judgment may be granted in a proper case. If the case is not fully adjudicated it may be dealt with as provided in subdivision (d) of Rule 56, and the right to summary recovery determined by a preliminary order, interlocutory in character, and the precise amount of recovery left for trial.

*Subdivision (d)*. Rule 54(a) defines "judgment" as including a decree and "any order from which an appeal lies." Subdivision (d) of Rule 56 indicates clearly, however, that a partial summary "judgment" is not a final judgment, and, therefore, that it is not appealable, unless in the particular case some statute allows an appeal from the interlocutory order involved. The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication is more nearly akin to the preliminary order under Rule 16, and likewise serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact. See *Leonard v. Socony-Vacuum Oil Co*. (C.C.A.7th, 1942) 130 F.(2d) 535; *Biggins v. Oltmer Iron Works* (C.C.A.7th, 1946) 154 F.(2d) 214; 3 *Moore's Federal Practice* (1938). 3190–3192. Since interlocutory appeals are not

allowed, except where specifically provided by statute (see 3 *Moore, op. cit. supra*, 3155–3156) this interpretation is in line with that policy, *Leonard v. Socony-Vacuum Oil Co., supra*. See also *Audi Vision Inc., v. RCA Mfg. Co*. (C.C.A.2d, 1943) 136 F.(2d) 621; *Toomey v. Toomey* (App.D.C. 1945) 149 F.(2d) 19; *Biggins v. Oltmer Iron Works, supra; Catlin v. United States* (1945) 324 U.S. 229.

**[SA-58]**

### NOTES OF ADVISORY COMMITTEE ON RULES—1963 AMENDMENT

*Subdivision (c)*. By the amendment "answers to interrogatories" are included among the materials which may be considered on motion for summary judgment. The phrase was inadvertently omitted from the rule, see 3 Barron & Holtzoff, *Federal Practice and Procedure* 159–60 (Wright ed. 1958), and the courts have generally reached by interpretation the result which will hereafter be required by the text of the amended rule. See Annot., 74 A.L.R.2d 984 (1960).

*Subdivision (e)*. The words "answers to interrogatories" are added in the third sentence of this subdivision to conform to the amendment of subdivision (c).

The last two sentences are added to overcome a line of cases, chiefly in the Third Circuit, which has impaired the utility of the summary judgment device. A typical case is as follows: A party supports his motion for summary judgment by affidavits or other evidentiary matters sufficient to show that there is no genuine issue as to a material fact. The adverse party, in opposing the motion, does not produce any evidentiary matter, or produces some but not enough to establish that there is a genuine issue for trial. Instead, the adverse party rests on averments of his pleadings which on their face present an issue. In this situation Third Circuit cases have taken the view that summary judgment must be denied, at least if the averments are "well-pleaded," and not suppositious, conclusory, or ultimate. See *Frederick Hart & Co., Inc. v. Recordgraph Corp*., 169 F.2d 580 (3d Cir. 1948); *United States ex rel. Kolton v. Halpern*, 260 F.2d 590 (3d Cir. 1958); *United States ex rel. Nobles v. Ivey Bros. Constr. Co., Inc*., 191 F.Supp. 383 (D.Del. 1961); *Jamison v. Pennsylvania Salt Mfg. Co*., 22 F.R.D. 238 (W.D.Pa. 1958); *Bunny Bear, Inc. v. Dennis Mitchell Industries*, 139 F.Supp. 542 (E.D.Pa. 1956); *Levy v. Equitable Life Assur. Society*, 18 F.R.D. 164 (E.D.Pa. 1955).

The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. The Third Circuit doctrine, which permits the pleadings themselves to stand in the way of granting an otherwise justified summary judgment, is incompatible with the basic purpose of the rule. See 6 *Moore's Federal Practice* 2069 (2d ed. 1953); 3 Barron & Holtzoff, supra, §1235.1.

It is hoped that the amendment will contribute to the more effective utilization of the salutary device of summary judgment.

The amendment is not intended to derogate from the solemnity of the pleadings. Rather it recognizes that, despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary.

Nor is the amendment designed to affect the ordinary standards applicable to the summary judgment motion. So, for example: Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate. Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented. And

**[SA-59]**

summary judgment may be inappropriate, even if the party opposing it shows under subdivision (f) that he cannot at the time present facts essential to justify his opposition.

NOTES OF ADVISORY COMMITTEE ON RULES—1987 AMENDMENT

The amendments are technical. No substantive change is intended.

COMMITTEE NOTES ON RULES—2007 AMENDMENT

The language of Rule 56 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Former Rule 56(a) and (b) referred to summary-judgment motions on or against a claim, counterclaim, or crossclaim, or to obtain a declaratory judgment. The list was incomplete. Rule 56 applies to third-party claimants, intervenors, claimants in interpleader, and others. Amended Rule 56(a) and (b) carry forward the present meaning by referring to a party claiming relief and a party against whom relief is sought.

Former Rule 56(c), (d), and (e) stated circumstances in which summary judgment "shall be rendered," the court "shall if practicable" ascertain facts existing without substantial controversy, and "if appropriate, shall" enter summary judgment. In each place "shall" is changed to "should." It is established that although there is no discretion to enter summary judgment when there is a genuine issue as to any material fact, there is discretion to deny summary judgment when it appears that there is no genuine issue as to any material fact. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256 –257 (1948). Many lower court decisions are gathered in 10A Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d, §2728. "Should" in amended Rule 56(c) recognizes that courts will seldom exercise the discretion to deny summary judgment when there is no genuine issue as to any material fact. Similarly sparing exercise of this discretion is appropriate under Rule 56(e)(2). Rule 56(d)(1), on the other hand, reflects the more open-ended discretion to decide whether it is practicable to determine what material facts are not genuinely at issue.

Former Rule 56(d) used a variety of different phrases to express the Rule 56(c) standard for summary judgment—that there is no genuine issue as to any material fact. Amended Rule 56(d) adopts terms directly parallel to Rule 56(c).

COMMITTEE NOTES ON RULES—2009 AMENDMENT

The timing provisions for summary judgment are outmoded. They are consolidated and substantially revised in new subdivision (c)(1). The new rule allows a party to move for summary judgment at any time, even as early as the commencement of the action. If the motion seems premature both subdivision (c)(1) and Rule 6(b) allow the court to extend the time to respond. The rule does set a presumptive deadline at 30 days after the close of all discovery.

The presumptive timing rules are default provisions that may be altered by an order in the case or by local rule. Scheduling orders are likely to supersede the rule provisions in most cases, deferring summary-judgment motions until a stated time or establishing different deadlines. Scheduling orders tailored to the needs of the specific case, perhaps adjusted as it progresses, are likely to work better than default rules. A scheduling order may be adjusted to adopt the parties' agreement on timing, or may require that discovery and motions occur in stages—including separation of expert-witness discovery from other discovery.

**[SA-60]**

Local rules may prove useful when local conditions or practices are incompatible with the general Rule 56 timing provisions.

If a motion for summary judgment is filed before a responsive pleading is due from a party affected by the motion, the time for responding to the motion is 21 days after the responsive pleading is due.

COMMITTEE NOTES ON RULES—2010 AMENDMENT

Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

*Subdivision (a).* Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word — genuine "issue" becomes genuine "dispute." "Dispute" better reflects the focus of a summary-judgment determination. As explained below, "shall" also is restored to the place it held from 1938 to 2007.

The first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense. The subdivision caption adopts the common phrase "partial summary judgment" to describe disposition of less than the whole action, whether or not the order grants all the relief requested by the motion.

"Shall" is restored to express the direction to grant summary judgment. The word "shall" in Rule 56 acquired significance over many decades of use. Rule 56 was amended in 2007 to replace "shall" with "should" as part of the Style Project, acting under a convention that prohibited any use of "shall." Comments on proposals to amend Rule 56, as published in 2008, have shown that neither of the choices available under the Style Project conventions — "must" or "should" — is suitable in light of the case law on whether a district court has discretion to deny summary judgment when there appears to be no genuine dispute as to any material fact. Compare *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case in which there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249 * * * (1948))," with *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Eliminating "shall" created an unacceptable risk of changing the summary-judgment standard. Restoring "shall" avoids the unintended consequences of any other word.

Subdivision (a) also adds a new direction that the court should state on the record the reasons for granting or denying the motion. Most courts recognize this practice. Among other advantages, a statement of reasons can facilitate an appeal or subsequent trial-court proceedings. It is particularly important to state the reasons for granting summary judgment. The form and detail of the statement of reasons are left to the court's discretion.

**[SA-61]**

The statement on denying summary judgment need not address every available reason. But identification of central issues may help the parties to focus further proceedings.

*Subdivision (b).* The timing provisions in former subdivisions (a) and (c) are superseded. Although the rule allows a motion for summary judgment to be filed at the commencement of an action, in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had. Scheduling orders or other pretrial orders can regulate timing to fit the needs of the case.

*Subdivision (c).* Subdivision (c) is new. It establishes a common procedure for several aspects of summary-judgment motions synthesized from similar elements developed in the cases or found in many local rules.

Subdivision (c)(1) addresses the ways to support an assertion that a fact can or cannot be genuinely disputed. It does not address the form for providing the required support. Different courts and judges have adopted different forms including, for example, directions that the support be included in the motion, made part of a separate statement of facts, interpolated in the body of a brief or memorandum, or provided in a separate statement of facts included in a brief or memorandum.

Subdivision (c)(1)(A) describes the familiar record materials commonly relied upon and requires that the movant cite the particular parts of the materials that support its fact positions. Materials that are not yet in the record — including materials referred to in an affidavit or declaration — must be placed in the record. Once materials are in the record, the court may, by order in the case, direct that the materials be gathered in an appendix, a party may voluntarily submit an appendix, or the parties may submit a joint appendix. The appendix procedure also may be established by local rule. Pointing to a specific location in an appendix satisfies the citation requirement. So too it may be convenient to direct that a party assist the court in locating materials buried in a voluminous record.

Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. One party, without citing any other materials, may respond or reply that materials cited to dispute or support a fact do not establish the absence or presence of a genuine dispute. And a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.

Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

Subdivision (c)(3) reflects judicial opinions and local rules provisions stating that the court may decide a motion for summary judgment without undertaking an independent search of the record. Nonetheless, the rule also recognizes that a court may consider record materials not called to its attention by the parties.

Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1). Other provisions are relocated or omitted. The requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or

**[SA-62]**

declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record.

A formal affidavit is no longer required. 28 U.S.C. § 1746 allows a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit.

*Subdivision (d).* Subdivision (d) carries forward without substantial change the provisions of former subdivision (f).

A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion.

*Subdivision (e).* Subdivision (e) addresses questions that arise when a party fails to support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c). As explained below, summary judgment cannot be granted by default even if there is a complete failure to respond to the motion, much less when an attempted response fails to comply with Rule 56(c) requirements. Nor should it be denied by default even if the movant completely fails to reply to a nonmovant's response. Before deciding on other possible action, subdivision (e)(1) recognizes that the court may afford an opportunity to properly support or address the fact. In many circumstances this opportunity will be the court's preferred first step.

Subdivision (e)(2) authorizes the court to consider a fact as undisputed for purposes of the motion when response or reply requirements are not satisfied. This approach reflects the "deemed admitted" provisions in many local rules. The fact is considered undisputed only for purposes of the motion; if summary judgment is denied, a party who failed to make a proper Rule 56 response or reply remains free to contest the fact in further proceedings. And the court may choose not to consider the fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute.

Subdivision (e)(3) recognizes that the court may grant summary judgment only if the motion and supporting materials — including the facts considered undisputed under subdivision (e)(2) — show that the movant is entitled to it. Considering some facts undisputed does not of itself allow summary judgment. If there is a proper response or reply as to some facts, the court cannot grant summary judgment without determining whether those facts can be genuinely disputed. Once the court has determined the set of facts — both those it has chosen to consider undisputed for want of a proper response or reply and any that cannot be genuinely disputed despite a procedurally proper response or reply — it must determine the legal consequences of these facts and permissible inferences from them.

Subdivision (e)(4) recognizes that still other orders may be appropriate. The choice among possible orders should be designed to encourage proper presentation of the record. Many courts take extra care with pro se litigants, advising them of the need to respond and the risk of losing by summary judgment if an adequate response is not filed. And the court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant.

*Subdivision (f).* Subdivision (f) brings into Rule 56 text a number of related procedures that have grown up in practice. After giving notice and a reasonable time to respond the court may grant summary judgment for the nonmoving party; grant a motion on legal or factual grounds not raised by the parties; or consider summary judgment on its own. In many cases it may prove useful first to invite a motion; the invited motion will automatically trigger the regular procedure of subdivision (c).

**[SA-63]**

*Subdivision (g).* Subdivision (g) applies when the court does not grant all the relief requested by a motion for summary judgment. It becomes relevant only after the court has applied the summary-judgment standard carried forward in subdivision (a) to each claim, defense, or part of a claim or defense, identified by the motion. Once that duty is discharged, the court may decide whether to apply the summary-judgment standard to dispose of a material fact that is not genuinely in dispute. The court must take care that this determination does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes.

If it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial. Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.

*Subdivision (h).* Subdivision (h) carries forward former subdivision (g) with three changes. Sanctions are made discretionary, not mandatory, reflecting the experience that courts seldom invoke the independent Rule 56 authority to impose sanctions. *See* Cecil & Cort, Federal Judicial Center Memorandum on Federal Rule of Civil Procedure 56 (g) Motions for Sanctions (April 2, 2007). In addition, the rule text is expanded to recognize the need to provide notice and a reasonable time to respond. Finally, authority to impose other appropriate sanctions also is recognized.

*Changes Made After Publication and Comment*

**Subdivision (a):** "[S]hould grant" was changed to "shall grant."

"[T]he movant shows that" was added.

Language about identifying the claim or defense was moved up from subdivision (c)(1) as published.

**Subdivision (b):** The specifications of times to respond and to reply were deleted.

Words referring to an order "in the case" were deleted.

**Subdivision (c):** The detailed "point-counterpoint" provisions published as subdivision (c)(1) and (2) were deleted.

The requirement that the court give notice before granting summary judgment on the basis of record materials not cited by the parties was deleted.

The provision that a party may accept or dispute a fact for purposes of the motion only was deleted.

**Subdivision (e):** The language was revised to reflect elimination of the point-counterpoint procedure from subdivision (c). The new language reaches failure to properly support an assertion of fact in a motion.

**Subdivision (f):** The provision requiring notice before denying summary judgment on grounds not raised by a party was deleted.

**[SA-64]**

**Subdivision (h):** Recognition of the authority to impose other appropriate sanctions was added.

**Other changes:** Many style changes were made to express more clearly the intended meaning of the published proposal.

# Title VII

Title VII of the Civil Rights Act of 1964 is a federal employment law that prohibits employment discrimination based on race, color, religion, sex (including pregnancy), and national origin. Title VII gives employees a private right to action. However, such claims cannot be brought against a specific individual, such as a supervisor.
Rather, employers are subject to vicarious liability to violations caused by its managing employees. Adverse employment actions and hostile work environments are examples of circumstances that can support a claim under Title VII.

Adverse employment actions are actions that cause a significant change in employment status, such as hiring, firing, failing to promote, and reassignment with significantly different responsibilities. For example, an employee's reassignment to a more arduous and less prestigious position, due to her gender, constitutes an adverse employment action.

Under Title VII, a hostile work environment exists when the workplace is "permeated with discriminatory, intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." For example, evidence of sexual harassment is sufficient to show a hostile work environment.

Title VII also imposes an obligation to employers to reasonably accommodate employees, such as leaves for religious observance or practice. The standard for such accommodations is a reasonable one, and the employer may refute accommodations that impose undue hardship on the employer's business. For example, the Supreme Court has held that unpaid leave for religious absences constitutes a reasonable accommodation to refute a claim under Title VII. However, it is also noted that unpaid leave would not be a reasonable accommodation if paid leave is provided for all purposes except religious ones.

Title VII is not the exclusive authority on employment discrimination law. Indeed, the Equal Pay Act (EPA) is another federal employment law giving employees a private right to action for discriminatory pay. However, Title VII cover types of wage discrimination not actionable under the EPA. A plaintiff may bring a claim under both the EPA and title VII so long as the plaintiff does not receive duplicative relief.

Moreover, many states have their own employment discrimination laws. For example, in New York, the Human Rights Law prohibits employers from refusing employment or fair compensation because of (among other characteristics) race, creed, color, national origin. Title VII does not preempt such state laws so long as they do not allow for acts that would be illegal under Title VII. As a result, state laws may supplement and even cover some shortcomings of Title VII. Nonetheless, concurrent with the preemption clause, Title VII may preempt state laws where those laws frustrate the purpose or execution of the federal law.

# [SA-66]

Notice of Appeal
[SA66]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
CHRISTA O'NEILL,

                              Plaintiff,

        -vs.-                                          **22 Civ. 5017 (JCM)**

                                                       **NOTICE OF APPEAL**

NEWBURGH ENLARGED CITY
SCHOOL DISTRICT,

                              Defendant.
-----------------------------------------X

        **NOTICE** is hereby given that Plaintiff CHRISTA O'NEILL hereby appeals to the United

States Court of Appeals for the Second Circuit from the Opinion and Order granting Defendants'

Motion for Summary Judgment dated June 26, 2024, duly entered in this action on the 26th day

of June 2024 (Docket No. 63) and the judgment entered on June 26, 2024 (Docket No. 64).

Dated: New York, New York
        July 25, 2024                          Respectfully submitted,

                                               STEWART LEE KARLIN
                                               LAW GROUP, PC


                                               _____
                                               STEWART LEE KARLIN
                                               Attorneys for Plaintiff
                                               111 John Street, 22nd Floor
                                               New York, N.Y. 10038
                                               (212) 792-9670